MASSACHUSETTS GENERAL HOSPITAL vs. RATE SETTING
COMMISSION & another.[1]

Suffolk.    October 4, 1976. — January 12, 1977.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*State Administrative Procedure Act.    Regulation.    Rate Setting Commission.    Words, "Regulation."*

A document issued by the Rate Setting Commission which defined certain terms in a commission regulation and outlined the procedure required for adjustments of rates under a section of the regulation was an "information bulletin" and not subject to the notice and hearing requirements of G. L. c. 30A, §§ 2-3. [711-713]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 8, 1975.

On transfer to the Superior Court the case was heard by *Linscott, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Albert G. Tierney, Jr. (Francis X. Flaherty, Jr.,* with him) for the plaintiff.

*Mitchell J. Sikora, Jr.,* Assistant Attorney General, for the defendants.

KAPLAN, J.    The plaintiff Massachusetts General Hospital (hospital) sought a declaration that a certain "information bulletin" of the defendant Rate Setting Commission (commission), purporting to elucidate one of the commission's regulations, was in fact itself a "regulation," and invalid for failure of the commission to afford notice and hearing prior to promulgation, as required for the effective adoption of an agency regulation by the State

---

[1] Secretary of the Commonwealth.

Administrative Procedure Act, G. L. c. 30A, §§ 2-3.[2] A judge of the Superior Court entered judgment for the defendants declaring that the information bulletin had been issued validly. The hospital lodged an appeal in the Appeals Court from this decision, also claiming, incidentally, that the judge had committed further error in failing to act to certify it as representative of a class of 180 hospitals. We granted an application for direct appellate review.[3]

In brief, the case is that the commission had in force as from October 1, 1974, a regulation 74-26 entitled "Hospital Prospective Rate Setting Regulation" which described the basis on which the commission establishes rates of reimbursement of health care providers, including the hospital, for their services rendered to certain publicly assisted patients.[4] The information bulletin in question, 74-26-9, was issued as an explanation of certain provisions of the regulation which deal with applications by providers for adjustment of rates because of program changes.

The parties appear to be in agreement that there is such a thing as an advisory or informational pronouncement by

---

[2] General Laws c. 30A, § 1 (5), as amended through St. 1970, c. 712, § 2, defines "regulation" in part as follows: " 'Regulation' includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the law enforced or administered by it, but does not include (*a*) advisory rulings issued under section eight; or (*b*) regulations concerning only the internal management or discipline of the adopting agency or any other agency, and not substantially affecting the rights of or the procedures available to the public or that portion of the public affected by the agency's activities; . . . ." Sections 2 and 3 set out the prerequisites of notice and hearing for the adoption of regulations.

See note 9 *infra.*

[3] The action was commenced originally in the Supreme Judicial Court for the county of Suffolk and was ordered transferred to the Superior Court where it was tried, with appeal as noted in the text.

[4] Under various Federal programs, the Commonwealth, pursuant to agreement with Federal authority, receives funds to assist it in reimbursing the providers. See Grants to States for Medical Assistance Programs, 42 U.S.C. §§ 1396-1396g (1970), as amended, 42 U.S.C. §§ 1396-1396i (Supp. IV, 1974).

an administrative agency that may be issued lawfully in relation to a regulation (or a statute) without going through the procedures required for promulgation of a regulation. They might also agree that it is no use trying to frame an airtight definition of such pronouncements which would serve to distinguish them from regulations; on the other hand, it may be possible to point to factors of differentiation in light of the functions or purposes that are furthered by notice and hearing in the given context.

Formal presentation by the agency with opportunity for "input" and debate by the persons affected, and deliberate resolution of issues by the officials, may be thought wasteful of time and energy where the agency is intending to fill in the details or clear up an ambiguity of an established policy, rather than to inaugurate a material change of policy.[5] One can imagine, too, that in the degree that what the agency puts forward is complex, or of broad or pervasive coverage, notice and hearing will appear increasingly plausible and useful, so that the agency's proposition will be denominated a regulation.[6] There is likely to be a similar reaction as the proposition is seen to involve difficulties of compliance.[7] A holding that notice and hearing are not required for a particular agency promulgation is cushioned by the consequence that it does not have the binding force attributable to a full-blown regulation.[8]

---

[5] See *Detroit Edison Co.* v. *EPA,* 496 F.2d 244 (6th Cir. 1974); *Lewis-Mota* v. *Secretary of Labor,* 469 F.2d 478 (2d Cir. 1972); *Texaco, Inc.* v. *FPC,* 412 F.2d 740 (3d Cir. 1969); *American President Lines, Ltd.* v. *FMC,* 316 F.2d 419 (D.C. Cir. 1963); *Gibson Wine Co.* v. *Snyder,* 194 F.2d 329 (D.C. Cir. 1952).

[6] See *Pickus* v. *United States Bd. of Parole,* 507 F.2d 1107, 1112-1113 (D.C. Cir. 1974); *Pharmaceutical Mfrs. Ass'n* v. *Finch,* 307 F. Supp. 858, 864 (D. Del. 1970).

[7] See *American Bancorp., Inc.* v. *Governors of Fed. Reserve Sys.,* 509 F.2d 29 (8th Cir. 1974); *Continental Oil Co.* v. *Burns,* 317 F. Supp. 194, 197-199 (D. Del. 1970).

[8] See *National Nutritional Foods Ass'n* v. *Weinberger,* 512 F.2d 688, 696 (2d Cir.), cert. denied, 423 U.S. 827 (1975); *Brennan* v. *Ace Hardware Corp.,* 495 F.2d 368, 376 (8th Cir. 1974); *Thomas* v. *County Office*

Such law as there is on the subject has been made largely by Federal courts in connection with the Federal Administrative Procedure Act. Those decisions are instructive for us even though the cognate State act is textually somewhat different from the Federal.[9] The case cited from our own reports as bearing on the question is in line with the suggestions set out above. *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Comm'n*, 354 Mass. 408 (1968). There the agency had issued a circular letter to the trade requiring consumer retail price schedules to reflect more currently certain discounts ("post-offs") allowed by wholesalers to retailers. This was thought to be merely an intensification or elaboration of the existing practice which would enhance its basic, understood purpose: we called it a "reinterpretation of the reasoning behind the application of existing rules" (at 414), and thus held it to be free of the notice and hearing requirements that would attach to a regulation under the State Administrative Procedure Act.

---

*Comm. of Cameron County,* 327 F. Supp. 1244, 1253 (S.D. Tex. 1971).

The commission has insisted throughout that the information bulletin is "nonbinding" but an applicant's compliance or noncompliance with it would presumably affect the commission's initial response to the particular application.

[9] The State Administrative Procedure Act does not in terms except "interpretative rules" from the procedural requirements for the adoption of regulations, as does the Federal act. See 5 U.S.C. §§ 553(b)(A), 553(d)(2) (1970). The draftsmen of the State act noted that the definition of "regulation" might include "letters or bulletins issued by agencies" though "not entitled regulations"; in other words, the substance, not the name, was to control. Sacks & Curran, 1954 Ann. Surv. of Mass. Law § 14.3 at 129. The exception in the definition of "regulation" for "advisory rulings" as defined in § 8 helps to show that information bulletins, as we seek to describe them in our text, are clear of the procedures for adopting regulations.

It may be noted that in 1969 the definition of regulation was amended to include the italicized words in the following sequence: "the whole or any part of every rule, regulation, standard or other requirement, *or interpretation thereof* of general application and future effect...." See St. 1969, c. 808, § 2. The next year the italicized words were removed by St. 1970, c. 712, § 2. See 1970 House Doc. No. 5390, at 2 (removal of the italicized words "would permit agencies to issue materials interpreting their regulations without compliance with the hearing and other requirements of the Administrative Procedure Act [as was the case before enactment of c. 808]").

Regulation 74-26 of the Rate Setting Commission is a twenty-one page, comprehensive statement of the commission's method of setting rates, with definitions of the several factors employed, prescriptions of the information to be furnished by the health providers to the commission and the records to be maintained by them, and outlines of other related procedures. The regulation covers rates of reimbursement for outpatient hospital services and rates for inpatient and well newborn services[10] (excepting aid to patients in long-term care facilities, covered more extensively in another regulation). It will be sufficiently illustrative to speak briefly of the inpatient rates. "[T]otal reimbursable inpatient operating costs" are computed for a "base year," two years earlier than the "rate year" for which reimbursement is being computed. These costs are adjusted forward over the intermediate and rate years by the use of an inflation factor (initially set at ten per cent for each of the two years but subject to change in certain circumstances) to produce the provider's reimbursable inpatient operating costs for the rate year. To these are added the provider's "reimbursable inpatient non-operating cost" as defined.[11] The total is divided by the allowable inpatient days of the base year. This results in an all-inclusive per diem rate for each publicly assisted patient receiving inpatient treatment during the rate year. (As might be expected, the allowable costs are described and discussed in the regulation in particular detail.)

As one of the commissioners has written (in a communication to another hospital which appears in evidence), "[t]he underlying basis of a prospective rate setting system is that the rate is stable and predictable. Adjustments to that rate are exceptions granted under unusual and specifically defined situations." Section 9.2 of Regulation 74-26 permits applications by providers for adjustments of

---

[10] The rate for well newborn inpatient services is one-third the rate established for regular inpatient services.

[11] This includes provision for such costs as depreciation, interest expense, and taxes. See Regulation 74-26, § 5.

rates in any of five situations,[12] the one now pertinent being the occurrence of an "incident" during the intermediate year in which the provider "has undertaken . . . a substantial program change not requiring a determination of need from the Department [of Public Health]." (§ 9.3 [b].)[13] The application "shall contain . . . a statement of the justification for the program change and a description of any review of the program change that may have been undertaken by the Department or by a comprehensive health planning agency. . . . In reviewing applications . . . , the Commission may request, or may require that the applicant request, a review of the application by the Department or by a comprehensive health planning agency." (*Ibid.*) An applicant here, as in other adjustment situations, "shall have the burden of assuring the adequacy of information provided to the Commission to justify an adjustment," and the application "shall contain information sufficient and in such detail as to permit the Commission to translate the expenditures relating to the incident . . . into reimbursable operating and non-operating costs . . . ." (§ 9.2)

The record shows that there was uncertainty among providers regarding adjustment for program changes under § 9.3 (b) and especially, perhaps, about the condition that the change be "substantial." After conferences with the Massachusetts Hospital Association, the commission, utilizing § 17 of the regulation which states that the commission might from time to time "issue informational bulletins

---

[12] In addition to application on account of a substantial program change not requiring a departmental determination of need (§ 9.3 [b]), there are applications for a substantial capital expenditure or substantial change in services subject to determination of need (§ 9.3 [a]), for the incurring of costs to satisfy certain governmental requirements (§ 9.3 [c]), because of arm's length transfer of ownership of the provider (§ 9.3 [d]), and for unusual or unforeseen increases in reasonable operating costs, not compensated by the inflation factor, which gravely threaten the financial stability of the provider (§ 9.3 [e]).

[13] Under the regulation, a proper expenditure that does not fall within § 9.3 (b) — e.g., because not "substantial" — could in the end fall into the reimbursement pattern by becoming an ingredient of a base year, and so forth, as described in our text.

interpreting or expanding upon provisions of this regulation,"[14] approved bulletin 74-26-9 (the ninth issued under Regulation 74-26) on February 6, 1975, with an effective date of October 1, 1974, and filed it with the Secretary of the Commonwealth on February 11, 1975.

The hospital's attack on the bulletin trembles on the brink of mootness because, as far as appears in the present record, the hospital had not applied or indicated any need to apply for adjustment for a program change undertaken during the intermediate year October 1, 1973, to September 30, 1974, the only pertinent intermediate year, since the bulletin was superseded and its substance issued after due formalities as a regulation with effect from October 1, 1975.[15] The trial judge, however, proceeded to the merits because he thought there was a chance that the hospital might yet find occasion to apply. We, too, shall go to the merits. On the merits we agree with the judge.

The bulletin was a one-page document. It defined a substantial program change as one involving an annual operating expense of more than $100,000 and constituting a "new service, different in nature from existing services," not merely an expansion or alteration in an existing service. The regulation contemplated that changes for which adjustments were sought would be considered separately and would not be aggregated. It was sensible to select some dollar amount for each, and the amount chosen was a not unfamiliar benchmark; a "substantial capital expenditure" for health facility construction requiring a certificate of need under G. L. c. 111, §§ 25B-25G, means an outlay of $100,000 or more. To adjust a rate for a program change of less than $100,000 might be thought inappropriate if typi-

---

[14] Section 17 provides: "*Informational Bulletin.* The Commission may, from time to time, issue informational bulletins interpreting or expanding upon provisions of this regulation. Such bulletins shall be deemed to be incorporated as part of this regulation, shall be distributed to providers, rates for which are determined under this regulation, and shall be accessible to the public at the Commission's offices during Commission business hours."

[15] The hospital neither appeared nor objected at the proceedings for adoption as a regulation.

cally it would not materially affect the provider's rate (see note 13 *supra*). The reference to a new service, different in nature, harmonized with the general design of the regulation as explained by the commissioner, and found a counterpart in G. L. c. 111, § 25B.[16]

The bulletin went on to require an applicant to satisfy the commission that the new program was needed to help insure the health or safety of the population served by the applicant, and was not duplicative of services within the geographic area served by the applicant. This conformed to the regulation which required an applicant to justify the program change as well as to provide a basis for the actual dollar adjustment sought.

According to the bulletin, the commission would require applications for adjustment submitted after February 1, 1975, to be accompanied by notice from the appropriate regional health planning council that that agency concurred in the finding of program need and approved the request for rate adjustment. Again there was a tracking of the regulation which stated that the commission might itself, or through the applicant, request a review of the application by such an agency, evidently with the purpose of giving weight to that review in passing on the application.

All this fit well within the concept of an information bulletin. There was complaint that procuring evidence or documentation with regard to nonduplication or need would seriously burden an applicant; as the trial judge put it, "the main complaint . . . is that the Bulletin appears to the hospital to be awkward, impractical, and cumbersome." So, where duplication existed, the bulletin said an applicant might still secure adjustment if it could "clearly demonstrate" that the existing service was inadequate, and in that connection evidence "may be considered" of the unavailability of that service to the general public or of excessive charges being made therefor. And with respect to

---

[16] A "substantial change in services" requiring a determination of need under G. L. c. 111, §§ 25B-25G, is defined as "a change in kind, rather than degree" under G. L. c. 111, § 25B, inserted by St. 1972, c. 776, § 3.

documentation as to need, the bulletin stated that evidence of population characteristics, disease incidence, projected utilization, and inaccessibility of similar services "may be required." But the testimony at trial did not establish that the information was so recondite or hard to obtain as to confound an earnest applicant; and we note that the furnishing of some of the more remote data was by the terms of the bulletin contingent on request by the commission which, we should assume, would not be made lightly or unreasonably. We conclude that there was no bar to the issuance of the bulletin.

The hospital's argument that it should have been certified at the threshold of the action as representative of a class of providers similarly situated, is sought to be supported by the citation of cases interpreting Rule 23 of the Federal Rules of Civil Procedure; but there is no requirement in our rule 23 (365 Mass. 767 [1974]), as there is in the Federal, that there be a determination by order "[a]s soon as practicable after the commencement of an action brought as a class action ... whether it is to be so maintained." We cannot say it was error for the judge to go at once to the merits of the claim; and if, indeed, it is conceived to have been error not to rule on the class issue, there would be little reason to reverse on that ground now, when the only effect might be to bind the class of providers to a determination they could consider adverse.

The hospital makes a series of arguments which seem to us to touch on the validity of the regulation proper. The record is not adequate to resolve such questions, and the trial judge did not reach them.

*Judgment affirmed.*