COMMONWEALTH *vs.* JOHN F. TRUMBLE
(and two companion cases[1].)

Suffolk. April 3, 1985. — October 15, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Constitutional Law*, Search and seizure, Roadblock by police. *Search and Seizure*, Automobile, Threshold police inquiry, Roadblock by police. *Motor Vehicle*, Operating under the influence. *Administrative Law*, Regulations.

A statement of procedures ("guidelines") for the conduct of police roadblocks as a method of detecting drunk drivers was not a regulation as that term is defined in the State Administrative Procedure Act, G. L. c. 30A, § 1 (5), where the guidelines concerned matters affecting only the internal management of the State police and did not purport directly to regulate public conduct. [88-89] ABRAMS, J., concurring.

This court, in response to a reported question of law and without determining whether a police roadblock is the least restrictive means of detecting drunk drivers or whether the least restrictive means is constitutionally required, concluded that a seizure made in the course of a roadblock carried out in accordance with certain comprehensive guidelines developed by State police supervisory personnel would be reasonable under both the Federal and State Constitutions. [89-90] ABRAMS, J., concurring. LYNCH, J., with whom LIACOS, J., joins, dissenting.

A police roadblock for the detection of drunk drivers, which was conducted in accordance with comprehensive guidelines developed by State police supervisory personnel with a view toward compliance with this court's opinion in *Commonwealth* v. *McGeoghegan*, 389 Mass. 137 (1983), was neither arbitrary nor capricious, nor violative of any right secured to motorists either by the Fourth and Fourteenth Amendments to the United States Constitution or by arts. 12 and 14 of the Massachusetts Declaration of Rights. [90-91] ABRAMS, J., concurring. LYNCH, J., with whom LIACOS, J., joins, dissenting.

This court declined to address a reported question of law which inquired whether police can constitutionally conduct a roadblock for the detection of drunk drivers without publicizing in advance their intention to do so. [91]

---

[1] Commonwealth *vs.* Edward F. Massey and Commonwealth *vs.* Howard E. Anderson, Jr.

COMPLAINTS received and sworn to in the Greenfield Division of the District Court Department on July 5, 1983.

Following transfer to the Supreme Judicial Court for the county of Suffolk, the cases were reported by *Liacos, J.*

*Byron D. Caplice* for Edward F. Massey.

*Robert J. Bray* for John F. Trumble & another.

*Edward F. Berlin*, Assistant District Attorney, for the Commonwealth.

*Francis X. Bellotti*, Attorney General, *Carl Valvo*, Assistant Attorney General, & *Stanley E. Adelman*, Special Assistant Attorney General, for the Secretary of Public Safety, amicus curiae, submitted a brief.

NOLAN, J. On July 2 and 3, 1983, State police officers conducted a roadblock on Route 116 in Sunderland. Each of the three defendants was stopped at the roadblock and, subsequently, arrested and charged with operating a motor vehicle while under the influence of alcohol. G. L. c. 90, § 24 (1984 ed.). Each defendant moved to suppress evidence obtained as a result of the roadblock, alleging violations of his rights under both the United States Constitution and the Declaration of Rights of the Massachusetts Constitution. The motion judge denied these motions. He made no findings of fact. The defendants appealed, and filed a petition to transfer the case to the Supreme Judicial Court for Suffolk County. The parties cooperated with the single justice, agreed on the facts, and framed the questions. After a hearing, a single justice reserved and reported the following questions to this Court:

"1. Were guidelines promulgated by the Secretary of Public Safety to govern drunk driving roadblocks properly promulgated and did they make adequate provisions so as not to offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and Massachusetts General Laws, Chapter 41, Section 98?[2]

---

[2] It is difficult to know why reference is made in all three questions to G. L. c. 41, § 98, because this statute is addressed to the powers of police officers in cities and towns. It does not reach the State Police who are governed, in the main, by G. L. c. 22.

"2. If the answer to Question 1 is in the affirmative, was the roadblock conducted on July 2nd and July 3rd, 1983 on Route 116 in Sunderland, executed in substantial compliance with the guidelines promulgated by the Secretary of Public Safety so as not to offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and Massachusetts General Laws, Chapter 41, Section 98?

"3. If the answer to Question 2 is in the affirmative, would a future roadblock conducted in substantial compliance with the guidelines in this case but without any notice or publicity still not offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights, and Massachusetts General Laws, Chapter 41, Section 98?"

For the reasons set forth below, we answer "Yes" to Questions 1 and 2 as we interpret them. We choose not to address the issues presented by Question 3. We have reproduced the guidelines in an Appendix to this opinion.

1. *Factual background.* The facts, as agreed upon by the parties, may be summarized as follows.

A. *Development and dissemination of the guidelines.* In March of 1983, the Governor of the Commonwealth and Charles V. Barry, Secretary of Public Safety of the Commonwealth, decided to implement a series of roadblocks in an attempt to deter drunk driving. Lieutenant Thomas K. Kennedy, the head of Research and Development for the State Police, in consultation with several individuals and organizations,[3] created a set of guidelines relative to roadblocks. The guidelines were developed with a view toward compliance with this court's opinion in *Commonwealth* v. *McGeoghegan,* 389 Mass. 137 (1983). The guidelines were never officially promulgated as certain regulations are required to be promul-

---

[3] The guidelines were developed in consultation with Secretary Barry, the Governor's Legal Counsel, the Drunk Driving Committee of the Governor's Anti-Crime Council, the Criminal Justice Training Council, the chief of police of Revere, and the National Highway Traffic Safety Administration.

gated. See generally G. L. c. 30A, §§ 2-3 (State Administrative Procedure Act).

On May 20, 1983, Secretary Barry's office decided that the first such roadblocks would be conducted on the upcoming July fourth weekend. On June 28, 1983, a training session was held at the State Police Academy. Captain James Port, Commanding Officer of the State Police Traffic Bureau, conducted the session, which was intended to train those in attendance to implement the guidelines at roadblocks to be conducted during the July fourth weekend. Those invited to the training session included the heads of all the State police troops in the Commonwealth, as well as their assistants. Each person who attended the session received a copy of the guidelines.

At this training session, Port emphasized that there should be no deviations from the guidelines while the roadblocks were being conducted. If an emergency occurred, any change in the procedures set forth in the guidelines would have to be made by the supervising officer.

A second training session took place at the Academy on June 30, 1983. At this session, a demonstration roadblock was conducted in accordance with the instructions provided at the June 28 session. Those attending the sessions were told that the following criteria were to be applied in selecting a roadblock site: high accident rates, high rates of drunk driving arrests, safety conditions, and motorist convenience.

B. *The Sunderland roadblock.* Captain Thomas J. Fitzgerald, the captain in charge of the State police in Western Massachusetts, accompanied by several assistants, attended the June 28 training session. Captain Fitzgerald also attended the June 30 session. He chose the site for the Sunderland roadblock, which was conducted on Route 116. The Route 116 patrol area is a high fatality area, and one with a high rate of drunk driving arrests.

The roadblock detail began at 7 P.M. on July 2, 1983. Thirteen uniformed State police officers, including Captain Fitzgerald and one other officer who had attended the June 28 training session, took part in the roadblock. Each trooper received approximately one hour of training, during which Fitz-

gerald explained the procedures set forth in the guidelines. Fitzgerald trained the troopers as he had been instructed at the two training sessions at the Academy. The roadblock was conducted in a manner consistent with the training of Fitzgerald.

The troopers were instructed to stop every automobile as it approached the roadblock site, but to allow trucks and tractor-trailer units to pass through the roadblock without stopping. They were told that the initial contact would be no more than one minute for each individual operator. During that brief period, the troopers were to say "Good evening, how are you, this is a State Police sobriety checkpoint, we would like you to have a copy of the brochure on drunk driving laws." If the troopers saw no problems, they were to say "Thank you," and allow the vehicle to proceed. The actual stopping time at the roadblock was approximately thirty seconds. During that period, the trooper was instructed to observe the operator, as well as the interior of the vehicle, to determine if there was any suspicion that the operator had been drinking.

If the trooper suspected that the operator had been drinking, the trooper was to instruct the operator to drive to a detention area. Unless the operator was extremely intoxicated, he or she would be permitted to drive the vehicle into this area. In the detention area, a driver would be asked to produce a license and registration, and to perform three field sobriety tests.

The roadblock began at approximately 11:30 P.M. on July 2, 1983, and ended at approximately 2 A.M. on July 3, 1983. Five hundred and three vehicles approached the roadblock. Each was stopped. Sixteen operators were detained for further checks. Eight operators, including the three defendants, were arrested.

C. *Publicity.* Prior to the July fourth weekend, information concerning the upcoming roadblocks was provided to the news media, including television, radio, and print. Secretary Barry and Captain Fitzgerald both spoke to members of the media. The public relations office of the State Police distributed press releases to over four hundred news media affiliates within the State. Several newspapers, radio stations, and television stations in Hampshire County disseminated information about the roadblocks both prior to and during the holiday weekend.

2. *Constitutional setting.* We note that, "[a]lthough the Massachusetts Declaration of Rights may afford greater protection to an individual than the protection afforded by the United States Constitution, . . . the same factors are material to a consideration of the constitutionality under either document of a roadblock stop of motor vehicles for the purpose of detecting drunk drivers" (citations omitted). *Commonwealth* v. *McGeoghegan, supra* at 141 n.2. It is well established that the stopping of each defendant's motor vehicle was a seizure within the Fourth and Fourteenth Amendments to the United States Constitution. *Delaware* v. *Prouse,* 440 U.S. 648, 653-654 (1979). Our inquiry becomes, therefore, whether the seizures were reasonable. *McGeoghegan, supra* at 139. Accordingly, we must balance the public interest against "the individual's right to personal security free from arbitrary interference by law officers." *United States* v. *Brignoni-Ponce,* 422 U.S. 873, 878 (1975). Some courts have thought it important in a constitutional sense that the prosecution demonstrate that, in dealing with the problem of drunk drivers, there is no alternative to roadblocks that would be as effective as, and less intrusive than, roadblocks. See *State* v. *Superior Court,* 143 Ariz. 45 (1984); *State* v. *Deskins,* 234 Kan. 529, 541 (1983); *State* v. *Koppel,* 127 N.H. 286, 291-292 (1985). We construe the questions asked of us as not raising this issue or the underlying question whether, for constitutional purposes, it matters whether there may be a less intrusive but equally effective means of dealing with the problem. Our construction of these questions is consistent with the views of the parties, who have not argued these points.

Clearly there exists a strong public interest in reducing the "carnage caused by drunk drivers." *South Dakota* v. *Neville,* 459 U.S. 553, 558 (1983). We take notice that traditional methods of law enforcement in this area have failed. Each year, over 25,000 people die in traffic accidents in which alcohol consumption is involved. H.R. Rep. No. 867, 97th Cong., 2d Sess. 7, reprinted in 1982 U.S. Code Cong. & Ad. News 3367. This total represents approximately half of the deaths resulting from motor vehicle accidents which occur on

our nation's roads each year. *Id.* In addition, over the past ten years more than one million people have received serious injuries in accidents involving drunken drivers. Massachusetts Senate Committee on Post Audit and Oversight, Drinking and Driving in Massachusetts: Statutory Options and Recommendations 1 (1982). Studies suggest that, on any weekend night in Massachusetts, between five and ten per cent of all drivers on the road will be seriously impaired by alcohol. *Id.*

In *McGeoghegan*, we considered whether a roadblock designed to detect drunk drivers could be conducted in a manner that would be constitutionally permissible. After considering relevant Supreme Court decisions in the area, we suggested that for a roadblock to be permissible, "the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel." *McGeoghegan, supra* at 143. We further suggested that advance notice of an intended roadblock, although perhaps not constitutionally mandated, would be appropriate because it would "have the virtue of reducing surprise, fear, and inconvenience." *Id.* We remain of the opinion that the above standards are relevant to any analysis of the validity of a roadblock procedure under both the State and Federal Constitutions.

Cases from other States which have considered roadblocks executed under guidelines are supportive. See, e.g., *Stark* v. *Perpich*, 590 F. Supp. 1057 (D. Minn. 1984); *State* v. *Golden*, 171 Ga. App. 27 (1984); *Little* v. *State*, 300 Md. 485 (1984). Cf. *State ex rel. Ekstrom* v. *Justice Court*, 136 Ariz. 1 (1983).

3. *Question 1*: "Were guidelines promulgated by the Secretary of Public Safety to govern drunk driving roadblocks properly promulgated and did they make adequate provisions so as not to offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and Massachusetts General Laws, Chapter 41, Section 98?"

*Promulgation of the guidelines.*[4] The defendants argue that the roadblock guidelines constituted "regulations" as that word is defined in G. L. c. 30A, § 1 (5) (1984 ed.),[5] and that therefore the guidelines are invalid because they were not promulgated as required by the State Administrative Procedure Act. See G. L. c. 30A, §§ 2-6. The defendants claim that the guidelines were of no effect and, consequently, the defendants' arrests constituted a denial of due process and a violation of their constitutional rights.

The defendants argue that the guidelines are of "general application," and thus fall within the purview of the Act. Determining whether a particular guideline or pronouncement constitutes a "regulation" under the Act may be a difficult task.[6] The language of the definition reflects an intent that it be interpreted broadly. See Curran & Sacks, The Massachusetts Administrative Procedure Act, 37 B.U.L. Rev. 70, 77 (1957). We conclude that these guidelines did not constitute a regulation.

---

[4] We acknowledge the brief submitted by the Secretary of Public Safety, amicus curiae, with respect to this issue.

[5] General Laws c. 30A, § 1 (5), provides the following definition of the term "regulation": "(5) 'Regulation' includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or interpret the law enforced or administered by it, but does not include (a) advisory rulings issued under section eight; or (b) regulations concerning only the internal management or discipline of the adopting agency or any other agency, and not substantially affecting the rights of or the procedures available to the public or that portion of the public affected by the agency's activities; or (d) regulations relating to the use of the public works, including streets and highways, when the substance of such regulations is indicated to the public by means of signs or signals; or (e) decisions issued in adjudicatory proceedings."

[6] We have intimated that "there is such a thing as an advisory or informational pronouncement by an administrative agency that may be issued lawfully in relation to a regulation (or a statute) without going through the procedures required for promulgation of a regulation." *Massachusetts Gen. Hosp.* v. *Rate Setting Comm'n,* 371 Mass. 705, 706-707 (1977). It also may be true that "it is no use trying to frame an airtight definition of such pronouncements which would serve to distinguish them from regulations . . . ." *Id.* at 707.

The guidelines concern the "internal management" of the State police department, and thus they fall within the exemption from the definition of a regulation by clause (b) of § 1 (5). We reject the defendants' interpretation of clause (b) as only applicable to rules concerning the organizational structure of an agency. The guidelines are directed solely toward troopers, and instruct them as to the manner in which they are to fulfil their duties. Thus, they do concern the internal management of this agency.

Clause (*b*) only applies to regulations that do not "substantially affect [ ] the rights of or the procedures available to the public . . . ." The guidelines describe the purpose and operational philosophy underlying the use of roadblocks. They limn important procedural and safety considerations. The guidelines reflect an attempt to ensure that the State police execute roadblocks in compliance with the principles articulated in *Commonwealth* v. *McGeoghegan, supra.* They do not purport directly to regulate public conduct. The guidelines are simply an accurate reflection of the rights of the public as set forth in *McGeoghegan.* We conclude that the guidelines are not regulations as defined in G. L. c. 30A, § 1 (5).

We turn to the roadblock procedures contained in the guidelines. The guidelines clearly proscribe the arbitrary selection of vehicles to be stopped. Ample provision is made to assure that the roadblock is conducted safely, including clear directions on the manner in which the sites should be selected and set up. The guidelines also address the element of motorist inconvenience, both with respect to traffic congestion and the brief nature of the initial stop. Furthermore, the guidelines require that a roadblock be planned in advance by supervisory personnel. The plans must include "date, location, time, duration, and set patterns of cars to be stopped." Finally, the guidelines provide that the supervisors will announce the date of an intended roadblock to the news media, at best three days prior to its implementation.

The guidelines at issue clearly comport with the *McGeoghegan* principles. Balancing the procedures against the public's interest in curtailing drunk driving, we conclude (without decid-

ing whether a roadblock is the least restrictive means or whether use of the least restrictive means is constitutionally required) that a seizure made in the course of a roadblock which is carried out pursuant to the guidelines would be reasonable under both the State and Federal Constitutions.

4. *Question 2*: "If the answer to Question 1 is in the affirmative, was the roadblock conducted on July 2nd and July 3rd, 1983 on Route 116 in Sunderland, executed in substantial compliance with the guidelines promulgated by the Secretary of Public Safety so as not to offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and Massachusetts General Laws, Chapter 41, Section 98?"

The Commonwealth bears the burden of proving the lawfulness of the Sunderland roadblock. *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). The roadblock was conducted pursuant to a plan developed by State police supervisory personnel. The parties agree that "[t]he roadblock was conducted consistent with the training of Captain Fitzgerald," who had received instruction at two roadblock training sessions. Captain Fitzgerald chose the roadblock site, following the criteria set forth in the guidelines. Publicity preceding the roadblock included stories on the television and radio, as well as thirteen newspaper articles.

Thirteen uniformed State troopers were present at the roadblock site. Five hundred feet before the stopping area there was placed a four by five foot reflectorized sign which read "Stop Ahead" "Roadblock." A safety cruiser with all of its lights illuminated was positioned directly across from the sign. Safety flares were placed throughout the roadblock area. A second sign and five flares were placed three hundred feet from the stopping point. Four cruisers were parked close to the stopping area. The stopping area was brightly illuminated by lights from a police van.

The troopers were instructed to stop every automobile that approached the site. Captain Fitzgerald stressed to those involved in the roadblock that there should be no deviation from the procedures set forth in the guidelines. Motorists passing

through the roadblock were stopped for approximately thirty seconds.

In sum, the conduct of the roadblock was most reasonable and entirely responsive to the requirements and directions laid down in *McGeoghegan.* The news media ran numerous stories advising the public of the announcement by the authorities that at least one roadblock would be conducted by the State police somewhere within the area patrolled by the State police assigned to the Northampton barracks. They limited the time within which a motorist would be stopped. The area was lighted and the police had no discretion in the selection of motorists to be stopped. This is clearly not arbitrary and capricious conduct.

There is nothing in the statement of agreed facts to indicate that the guidelines were not carefully followed in this case.

5. *Question 3*: "If the answer to Question 2 is in the affirmative, would a future roadblock conducted in substantial compliance with the guidelines in this case but without any notice or publicity still not offend the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights, and Massachusetts General Laws, Chapter 41, Section 98?"

We choose not to address this issue. As a general rule, this court does not express an opinion on hypothetical questions involving constitutional law. *Solomon* v. *School Comm. of Boston*, 395 Mass. 12, 19 (1985). The defendant has ignored it completely and the Commonwealth's brief has given us the benefit of only two paragraphs. We leave this constitutional question for another day. See *Commonwealth* v. *Paasche*, 391 Mass. 18, 21 (1984).

6. We answer "Yes" to Questions 1 and 2, as we have construed them. We decline to answer Question 3. The case is remanded to the county court for disposition consistent with this opinion.

APPENDIX.

## "MASSACHUSETTS STATE POLICE DWI ROADBLOCK ENFORCEMENT

"PURPOSE: Apprehension of individuals driving while drunk or while under the influence of alcohol or drugs.

"METHOD: Use of pre-selected roadblock locations conducted under the following guidelines.

"OPERATIONAL

PHILOSOPHY: Drunk driving roadblocks checkpoints cannot be of less public benefit than the behavior they are trying to displace, nor can they create more of a traffic hazard by their operation than the results of the driving behavior they are trying to modify.

"OPERATIONAL

PLANNING: Each individual *roadblock* must be planned in advance of actual implementation. All specifics as to the conduct of the roadblock must be pre-planned and not randomly or arbitrarily implemented at the site.

"PERSONNEL: Only uniformed officers who have been trained in roadblock tactics should participate. A trained supervisor must be present.

"ROADBLOCK

PLANS: Roadblock plans must be developed by department supervisors and disseminated to participants prior to implementation. Plans must include date, location, time, duration, and set patterns of cars to be stopped.

"BASIC

CONSIDERATIONS:    — Selection of vehicles to be stopped must not be arbitrary.
— Safety must be assured.
— Motorist inconvenience must be minimized.
— Action undertaken must be according to a written plan and supervised.
— Advanced public notice must be given to reduce surprise, fear, and inconvenience for the motorist.

"SITE

SELECTION: Problem areas — where accidents or prior arrests for drunken driving have occurred. Specific areas to be selected by respective administrators and supervisors.

A.    Individual site selection should be based on selective enforcement identifiers as to time, place and cause of prior serious injury accidents.

B.    Site should allow officers to pull vehicles out of the traffic stream without causing a significant intrusion to them and/or creating a safety hazard because of a traffic back-up. It is suggested that areas adjacent to rest areas or parking lots be utilized.

C.    Selected sites should allow for visibility of on-coming motorists, safety for stopped vehicles, as well as safety for the officers.

D.    Alternative sites should be pre-selected should traffic congestion occur at primary site.

"SAFETY
CONSIDERATIONS:  Advanced warning for on-coming vehicles

A.    Signs (recommended)

B.    Sufficient roadflares to be placed on the shoulder of road.

C.    Police vehicles with flashing lights.

D.    Traffic is to be stopped by a uniformed officer, giving a visual stop signal.

E.    Where possible vehicles should be pulled off the road (rest area, parking lot, etc.)

F.    Sufficient quantity and visibility of uniformed police and cruisers to assure speedy compliance, minimize inconvenience and reduce public fear and apprehension.

G.    Each vehicle at the checkpoint is to be stopped for a period of one minute or less with the operator and all occupants remaining seated in the vehicle.

H.    No physical barriers are to be used.

"ADVANCED
NOTICE:  Announcement of the date of the intended checkpoint, without announcing its precise location, will be made by the checkpoint supervisors to the news media at least three (3) days prior to the implementation of the checkpoint. Press releases should be structured to educate the public as to the purpose of the checkpoint, to encourage public support and to solicit cooperation. The tone of the article should provide some measure of deterrence for drunk driving.

"SOBRIETY
CHECKS:  Inconvenience must be minimized.

A.    A very brief and courteous statement should be made by officers manning the checkpoints: Example — "Good evening, this is a routine sobriety checkpoint. Sorry for the inconvenience, good night."

B.    Only upon observing an articulable sign of possible intoxication will further inquiry be warranted. In other words, the officer should develop at least an indication that the driver has been consuming alcohol before asking for a driver's license or engaging in conversation regarding the consumption of alcohol.

C.    A supervisor must be present at all Sobriety Checkpoints and it is he/she who will decide on the setup at the location to ensure safety for all. The Supervisor will also decide:
1. The number of vehicles to be stopped
    (a) all vehicles

    (b) set number, i.e., (1) one of every ten passing cars

"NOTE—Random, discretionary stops, unsupported by probable cause, reasonable suspicion, or even some less stringent standard, are unreasonable and therefore, impermissible. Requests for license and registration should not be undertaken unless probable cause is determined.

> 2. Duration of checkpoint, not to exceed two hours unless Troop Commander requires a checkpoint exceeding that time

"ARREST
PROCEDURES:
  A.   If after brief stop, the officer develops specific and articulable facts which lead the officer to believe the motorist may be intoxicated:
       1. Vehicle operator requested to drive onto the shoulder of road
       2. Driver requested to produce license and registration
       3. Driver may be requested to perform certain motor coordination tests

  B.   If arrested, suspect should be taken to nearest State Police Barracks for processing by arresting officer.

"JUDICIAL
 SUPPORT: District Attorney's [*sic*] should be contacted prior to the implementation of the roadblocks for their input into the types of evidential information that will be needed to prosecute cases.

"RECORD KEEPING:   Officer-in-charge of roadblock operation will insure that adequate records will be kept of each operation. Information to be collected shall include but not be limited to the following:
  A.   Number of vehicles passing through roadblocks, i.e., total vehicles stopped or not
  B.   Number of vehicles checked, i.e. total vehicles checked
  C.   Number of vehicles detained for further check i.e. license and registration etc.
  D.   All other data required on A.R.C.P. forms to be used for roadblock operation only (separate form for two hour period).
  E.   All unusual occurrences shall be noted under remarks

"NOTE Accurate records are necessary on all parts of roadblock operations in anticipation of eventual court cases."

ABRAMS, J. (concurring). I concur in the court's decision. Other States have concluded that roadblocks subject to guidelines that restrict police discretion are constitutionally permissible. See, e.g., *United States* v. *Prichard,* 645 F.2d 845 (10th Cir.), cert. denied, 454 U.S. 832 (1981); *State* v. *Superior Court,* 143 Ariz. 45 (1984); *State* v. *Garcia,* 481 N.E.2d 148 (Ind. Ct. App. 1985); *State* v. *Deskins,* 234 Kan.

529 (1983); *Kinslow* v. *Commonwealth,* 660 S.W.2d 677 (Ky. Ct. App. 1983), cert. denied, 465 U.S. 1105 (1984); *State* v. *Cloukey,* 486 A.2d 143 (Me. 1985); *Little* v. *State,* 300 Md. 485 (1984); *People* v. *Scott,* 63 N.Y.2d 518 (1984); *State* v. *Shankle,* 58 Or. App. 134 (1982); *State* v. *Martin,* 145 Vt. 562 (1985); *State* v. *Coccomo,* 177 N.J. Super. 575 (1980). See also *People* v. *Meitz,* 95 Ill. App. 3d 1033 (1981). See generally Annot., 37 A.L.R. 4th 10 (1985).

Although "there is no 'typical' sobriety checkpoint roadblock," Rogers, The Drunk-Driving Roadblock: Random Seizure or Minimal Instrusion?, 21 Crim. L. Bull. 197, 204 (1985), it is possible to distill from the case law and legal commentators the principles necessary to pass constitutional muster. There must exist "(1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists;[1] (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending instrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to 'show . . . the police power of the community'; and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria." *State* v. *Hilleshiem,* 291 N.W.2d 314, 318 (Iowa 1980). See *State* v. *Deskins, supra* at 541; *State* v. *Coccomo, supra* at 581. See generally Rogers,

---

[1] Decisions involving fixed or permanent immigration checkpoints lend further guidance in determining the reasonableness of a roadblock. See, e.g., *United States* v. *Martinez-Fuerte,* 428 U.S. 543 (1976). Some courts have extrapolated from the Border Patrol cases the requirement that a checkpoint be "permanent," See, e.g., *State* v. *Olgaard,* 248 N.W.2d 392, 394 (S.D. 1976).

In *Delaware* v. *Prouse,* 440 U.S. 648 (1979), however, the Court did not refer to "permanent" checkpoints. Rather, it allowed "for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id.* at 663.

The defendants, however, have not raised the issue of "permanence" and the court need not reach it. I only note, however, that the roadblock here was not a roving patrol; it was in a fixed location not subject to police officers' discretion.

*supra* at 204; Comment, Filling in the Blanks after Prouse: A New Standard for the Drinking-Driving Roadblock, 20 Land & Water L. Rev. 241, 254-257 (1985); Note, Curbing the Drunk Driver Under the Fourth Amendment: The Constitutionality of Roadblock Seizures, 71 Geo. L.J. 1457, 1482-1484 (1983). In these cases there is no suggestion that the guidelines do not meet these standards or that the police did not follow the promulgated guidelines.[2]

As I read *Delaware* v. *Prouse*, 440 U.S. 648, 653-654 (1979), the linchpin for constitutional roadblocks is that police officers not possess "unconstrained discretion." The guidelines here provided for record keeping; for tailoring the application of roadblocks to places of previous injuries; for use of "areas adjacent to rest area or parking lots"; and for advance public announcement of the intended checkpoint. The guidelines approached more closely than may be strictly necessary those needed for the minimization of intrusion and the maximization of safety.[3] See, e.g., Comment, Filling in the Blanks after Prouse: A New Standard for the Drinking-Driving Roadblock, 20 Land & Water L. Rev. 241 (1985).

The thrust of the defendants' argument is that "[b]y eliminating the requirement that an officer act only on reasonable and articulable facts or probable cause, which is subject to judicial review, the standardless intrusion by an officer eludes scrutiny and renders the Fourth Amendment (as well as art. 14 of the Declaration of Rights) a virtual nullity." The Supreme Court, however, has already indicated that, in the appropriate circumstances, roadblock stops do not violate motorists' Federal constitutional rights. See *Delaware* v. *Prouse, supra* at 663.

---

[2] In their brief, the defendants suggest that, even with the guidelines, an individual driver who is detained may be subject to arbitrary police conduct during the detention. Nothing the court holds prevents an individual driver from raising a claim of violation of constitutional rights during a particular seizure and detention. The burden of justifying police conduct during the challenged warrantless seizure and detention is on the Commonwealth. See *Commonwealth* v. *Antobenedetto*, 366 Mass. 51 (1974).

[3] On this issue, the defendants do not make any separate argument that the State Constitution's standard differs from the Federal standard.

I also reject the defendants' argument that a failure to follow G. L. c. 30A (1984 ed.) in issuing the guidelines would make constitutionally infirm any seizure made at any roadblock conducted pursuant to the guidelines. The State's violation of its own statute does not necessarily amount to a Federal or State constitutional violation. "[E]ven the outright violation of state law by local officers 'is a matter primarily of concern to the state and does not implicate the Constitution' — absent 'fundamental procedural irregularity, racial animus or the like.'" *Roy* v. *Augusta,* 712 F.2d 1517, 1523 (1st Cir. 1983), quoting *Creative Env'ts, Inc.* v. *Estabrook,* 680 F.2d 822, 833 (1st Cir.), cert. denied, 459 U.S. 989 (1982). See, e.g., *Haines* v. *Kerner,* 492 F.2d 937, 941 n.8 (7th Cir. 1974) (not every violation of State law or agency regulation constitutes a denial of a constitutionally protected liberty or property interest); *United States* v. *Leahey,* 434 F.2d 7, 11 (1st Cir. 1970) (agencies do not always violate due process when they fail to adhere to their procedures). Moreover, the defendants made no showing that the Commonwealth's failure to promulgate the guidelines under c. 30A procedures offends due process by denying citizens a constitutionally protected liberty or property right.

Last, although we said that roadblocks coupled with advance publicity "may achieve a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means," *Commonwealth* v. *McGeoghegan,* 389 Mass. 137, 143-144 (1983), we have never considered whether the Commonwealth *must* show that roadblocks are the least intrusive means or must meet some lower standard in order to pass constitutional muster. That issue has not been briefed or argued by the defendants. Generally, issues not briefed or argued to the court are deemed waived. *Commonwealth* v. *Louraine,* 390 Mass. 28, 38 n.13 (1983). Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). I think it would be unfair to the Commonwealth to reach this issue, as the dissenting Justices urge us to do, because the defendants have not briefed or argued the issue and the Commonwealth was compelled to stipulate to facts in order to facilitate this appeal. This issue

should be decided on a record fully developed by the adversary process.

The guidelines here at issue are an attempt to reduce the threat of drivers who drive while under the influence of intoxicating liquor while remaining sensitive to the individual motorist's expectation of privacy. "No one can deny the State's vital interest in promoting public safety upon our roads by detecting and prosecuting drunk drivers. These drivers are a threat to other motorists, to pedestrians and to themselves." *State* v. *Coccomo, supra* at 582. On the issues raised by the defendants, there was no error in denying the motions to suppress.

LYNCH, J. (dissenting with whom Liacos, J., joins). The court properly acknowledges that the stopping of each defendant's motor vehicle was a seizure under the Fourth and Fourteenth Amendments to the United States Constitution. *Ante* at 86. See *Delaware* v. *Prouse*, 440 U.S. 648, 653-654 (1979). The court also properly states that the Commonwealth bears the burden of proof on the issue of lawfulness of the seizure. *Ante* at 90. See *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 144 (1983). The court has failed, however, to appreciate the full implications of this burden. The Sunderland roadblock resulted in an intrusion into the right of several hundred people to be free from arbitrary interference by law enforcement officials. If such an intrusion can ever be said to be reasonable in a constitutional sense, it can only be after the Commonwealth has met its burden of showing that "[s]uch a procedure [achieves] a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means." *Commonwealth* v. *McGeoghegan, supra* at 143-144. The court apparently assumes that roadblocks are a reasonable mechanism for advancing the public interest in curbing drunk driving, and examines merely whether the guidelines at issue and their application in this case are reasonable. Since I am unable to find any basis in the record for concluding that roadblocks are

more effective than less intrusive mechanisms for curbing drunk driving,[1] I respectfully dissent.

"No method of spot checking motor vehicles to discover drunk drivers, in the absence of probable cause or articulable suspicion, has been held by the Supreme Court of the United States to be constitutionally permissible." *Commonwealth* v. *McGeoghegan, supra* at 139. That Court has repeatedly emphasized that a factor to be weighed in determining whether a roadblock is constitutional is "the absence of practical alternatives" for protecting the public interest. See, e.g., *Delaware* v. *Prouse, supra* at 655, quoting *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 881 (1975). Even when a vital State interest is implicated, "[t]he question remains . . . whether in the service of these important ends the [roadblock] is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail." *Delaware* v. *Prouse, supra* at 659. There, the Court concluded, "Given the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.* The Court stated, furthermore, that "[t]he foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations." *Id.*

Nor has this court previously decided that the Commonwealth had met its burden to show the reasonableness of a roadblock conducted under the circumstances of the one in question here. Nevertheless, the court relieves the Commonwealth of its burden to show that the roadblock was more effective in advancing the public interest in curbing drunk driving than alternative, less intrusive mechanisms. Other courts have recognized that the State must make this showing,

---

[1] At least one objective study supports the contrary proposition and demonstrates that a roadblock program was an ineffective technique by which to deter and detect drunk driving. See *Little* v. *State*, 300 Md. 485, 516-517 (1984) (Davidson, J., dissenting). It is not enough to say, as does the court, that this issue is not raised by the reported questions because without such a showing the roadblock could not pass constitutional muster.

and have struck down roadblocks partly on this basis. See, e.g., *State* v. *Koppel*, 127 N.H. 286 (1985);[2] *Jones* v. *State*, 459 So. 2d 1068, 1077 (Fla. Dist. Ct. App. 1984); *State* v. *McLaughlin*, 471 N.E.2d 1125, 1141 (Ind. Ct. App. 1984); *People* v. *Bartley*, 125 Ill. App. 3d 575 (1984); *State ex rel. Ekstrom* v. *Justice Court*, 136 Ariz. 1, 5 (1983). Cf. *State* v. *Superior Court*, 143 Ariz. 45, 48-49 (1984) (upholding roadblock where State official offered evidence that there were no less intrusive alternatives). See also *State* v. *Deskins*, 234 Kan. 529, 544-545 (1983) (Prager, J., dissenting) ("The most pressing question before us is the degree to which this roadblock checkpoint actually promoted the public interest in deterring drunk drivers. . . . In my judgment, the trial court correctly concluded that the State failed in its burden of proof in establishing that the roadblock checkpoint promoted the public interest in light of available less drastic alternative measures which could have been used by the officers to combat the problem, without setting up a roadblock and stopping between 2,000 and 3,000 motorists.")

The record in this case clearly raises the question whether the Sunderland roadblock of July 2-3, 1983, was as effective in curbing drunk driving as traditional, less intrusive alternatives. During approximately two and one-half hours, State police officers stopped 503 vehicles. Although the roadblock claimed the services of thirteen officers and caused an intrusion into the Fourth Amendment rights of several hundred law-abiding citizens, it resulted in only eight arrests. There is no showing in the record that the roadblock was more effective than less intrusive mechanisms would have been.[3]

---

[2] The court's holding, however, rested solely on an interpretation of the New Hampshire Constitution. Although the language of Part I, article 19, the relevant section of the New Hampshire Constitution, is "similar to that in the Federal Constitution," article 19 was construed to provide greater protection for individual rights than the Fourth Amendment. *State* v. *Koppel, supra* at 289.

[3] The police could have patrolled the roadways and stopped any motor vehicle where the driver's conduct raised a reasonable suspicion of intoxication. See *Terry* v. *Ohio*, 392 U.S. 1 (1968). Also, the police could have conducted a surveillance of local bars and restaurants.

The Commonwealth has argued that, even though fewer than two per cent of the drivers stopped at the Sunderland roadblock were ultimately arrested, the roadblock program nevertheless serves as a deterrent and has contributed to a decline in highway fatalities. As an appendix to its brief, the Commonwealth has presented a graph showing a decline in highway fatalities during the period July 1 through Labor Day weekend for the years 1981-1983. Absent a clear showing of a causal relationship, the Commonwealth cannot claim this decline resulted solely from the use of roadblocks rather than from increased public and media attention to the problem, as well as more emphasis on the more traditional, less intrusive means of enforcement. The decline in highway fatalities in 1982 and 1983 could also reflect a change in public perception of drunk driving due to the imposition of stricter criminal penalties for driving under the influence.[4] The Commonwealth has failed to demonstrate that the decline in highway fatalities is attributable to institution of a roadblock program, and has also not shown that the same or greater declines could not have been achieved by use of less intrusive mechanisms.[5]

The court's holding that the seizures at the Sunderland roadblocks were reasonable contrasts sharply with other decisions of this court concerning the scope of protection afforded by the Fourth Amendment. See, e.g., *Commonwealth* v. *Pietrass*, 392 Mass. 892, 898-900 (1984) (even though there was probable cause to arrest the defendant on charges of aggravated rape and other violent crimes, the Commonwealth failed to meet its burden of showing exigency, so the police were not justified in making a warrantless entry of a dwelling to arrest

---

[4]In 1982, the Legislature amended G. L. c. 90, § 24 (1) (*a*) (1), to impose stricter penalties for operating a motor vehicle while under the influence of intoxicating liquor. The minimum fine was increased from $35 to $100. Furthermore, first offenders may now be imprisoned for up to two years. See G. L. c. 90, § 24 (1) (a) (1) (1984 ed.).

[5]Although I do not reach the question, I have some doubts concerning the court's conclusion that the promulgation of the roadblock guidelines need not have been in compliance with the requirements for adopting regulations under G. L. c. 30A, §§ 2 & 3 (1984 ed.).

him); *Commonwealth* v. *Thibeau*, 384 Mass. 762, 763-764 (1981) (even though defendant was riding a bicycle, a known means of transporting illegal drugs, and made a sudden left turn as police cruiser approached, police lacked probable cause to arrest him and seize envelopes containing narcotics that were sticking out of his pocket); *Commonwealth* v. *Bacon*, 381 Mass. 642, 645-646 (1980) (police were not justified in making investigatory stop of relatively expensive motor vehicle operated by two youthful appearing men, even though one attempted to conceal his face, presumably from police view). I am unable to reconcile the court's ruling that the Commonwealth has sustained its burden in this case with the traditional concern this court has expressed for protecting Fourth Amendment rights. Here, the court concludes that the warrantless stop of 503 vehicles was justified even though the police lacked a basis for suspecting that any particular operator was or had been engaged in criminal activity. The court gives no satisfactory explanation for why it has suddenly lowered the threshold showing which the Commonwealth has traditionally been required to make to justify a warrantless stop or arrest. I would answer "no" to question 2 and decline to answer questions 1 and 3.