ANTHONY JACKSON vs. COMMISSIONER OF CORRECTION
& others.

Suffolk. December 9, 1982. — April 8, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Imprisonment.*

The record in a prisoner's action to enjoin the Commissioner of Correction from transferring him from one institution to another supported the special master's conclusion that the decision to transfer him had been made in good faith, based on the prisoner's criminal history and security needs, rather than retaliation for frequent litigation that the prisoner had initiated against correctional officials, and that the transfer was a reasonable exercise of the Commissioner's statutory power to determine placement of prisoners within the prison system. [703-705]

Where a decision by the Commissioner of Correction to transfer a prisoner from a medium security to a maximum security facility had been based upon the prisoner's over-all record, including both the fact that he was serving three consecutive life sentences and the seriousness of his offenses, there was, in the circumstances, no merit to the prisoner's contention that the decision to transfer him had been unfairly influenced by two disciplinary infractions of which he had been found guilty after institutional hearings that he claimed were procedurally defective. [705-706]

The Commissioner of Correction reasonably exercised his discretion in deciding to transfer a prisoner from a medium security correctional facility to a maximum security facility and gave appropriate consideration to the prisoner's safety. [706]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 1, 1979.

The case was heard by *Nolan, J.*, on a master's report.

*J. Russell Hodgdon* for the plaintiff.

*Michael C. Donahue,* Special Assistant Attorney General, for Commissioner of Correction.

LYNCH, J.  The plaintiff, Anthony Jackson, appeals from a judgment by a single justice of this court confirming the report of the special master and commissioner (special master) in the matter of the plaintiff's complaint against the Commissioner of Correction (Commissioner).  The special master had recommended that judgment be entered dismissing Jackson's petition for injunctive relief.  We affirm.

The special master (Justice Cutter) made the following findings of facts.  Anthony Jackson is presently confined under the supervision of the Department of Correction of the Commonwealth (DOC) in a segregation unit at Southeastern Correctional Center at Bridgewater (S.E.C.C.).  Jackson is serving three consecutive life sentences for murder in the first degree, plus miscellaneous sentences for rape and other serious crimes.[1]  On October 26, 1979, he brought a complaint seeking an injunction against the Commissioner which would prohibit the Commissioner from transferring him from S.E.C.C. to the first floor of Block B-9 in the Massachusetts Correctional Institution at Walpole (M.C.I. Walpole) and would order the Commissioner to return Jackson to protective custody in the B-Annex of S.E.C.C.  Jackson argues that he would be apprehensive about his safety if he were transferred back to M.C.I. Walpole.  Jackson's fears arise from an incident which occurred after he was first transferred to M.C.I. Walpole in June, 1976.  On June 29, 1976, Jackson was convicted on two indictments and sent to M.C.I. Walpole.  As of July 9, 1976, he was given a maximum security rating.  M.C.I. Walpole is the only maximum security prison in the Commonwealth.[2]  Shortly after his arrival approximately eight inmates entered Jackson's cell, beat him, and poured a disinfectant into his eyes.  Jackson was taken immediately

---

[1] We have affirmed the defendant's convictions in certain of these cases.  See *Commonwealth* v. *Jackson, ante* 98 (1983); *Commonwealth* v. *Jackson,* 384 Mass. 572 (1981); *Commonwealth* v. *Jackson,* 376 Mass. 790 (1978).

[2] Jackson has at all times relevant to this appeal retained this maximum security rating.

to the Norwood Hospital for treatment. After his discharge from the hospital he was transferred to the State Hospital at the Massachusetts Correctional Institution at Bridgewater.

While Jackson was at the Bridgewater State Hospital in July, 1977, a new classification report was made. He was still rated a maximum security inmate but his placement was deferred. The classification committee concluded that "Jackson should have a maximum security rating in every sense of the word" because he had shown himself to be a danger to himself and others and he was an escape risk. On his release from the hospital, Jackson was placed in protective custody in S.E.C.C. which is within the Bridgewater complex. The special master found that S.E.C.C., as a whole, is a medium security institution with perimeter security that is somewhat unsatisfactory.

Jackson appeared before another classification board on August 23, 1979. This hearing was convened as a result of two disciplinary reports Jackson had received on July 12, 1979.[3] Jackson's counsel at this hearing objected to the use of the disciplinary reports as any basis for assessing Jackson's classification. In determining Jackson's status, however, the board primarily considered the seriousness of the disciplinary reports and Jackson's effect on the running of the institution. The board recommended unanimously that Jackson be transferred back to M.C.I. Walpole and placed in protective custody status in Block B-9.

Despite this recommendation, Jackson was still not transferred to M.C.I. Walpole. On October 31, 1979, the Commissioner convened a special departmental review board (special board) to reconsider the recommendation of the previous classification board and to make a determination of the propriety of Jackson's continued placement in a medium security institution. The Commissioner directed the special board to make its determination based upon an evaluation of Jackson's over-all record since entering the

[3] Jackson had been found guilty of these disciplinary offenses after a hearing at which he was represented by counsel.

correctional system and to give weight to recent disciplinary reports only as a part of the over-all evaluation. This special board also unanimously recommended that Jackson be transferred to protective custody status in Block B-9 in M.C.I. Walpole. The special board based its recommendation on a review of Jackson's entire institutional record, the serious criminal offenses of which Jackson had been convicted, the length and consecutive nature of many of Jackson's sentences which provide a strong incentive for escape attempts, and the risks to the public in the event of Jackson's escape from this medium security environment. The Commissioner approved the special board's recommendation after reviewing Jackson's entire file.

1. The Commissioner has broad discretion under Massachusetts law to transfer and to place inmates confined within the Massachusetts correctional system. General Laws c. 127, § 97, as appearing in St. 1968, c. 627, provides that "[t]he Commissioner may transfer any sentenced prisoner from one correctional institution of the Commonwealth to another . . . ." In discussing this statute the United States Supreme Court has stated that "transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer in a wide variety of circumstances is vested in prison officials." *Meachum* v. *Fano,* 427 U.S. 215, 226-227 (1976). Thus, under Massachusetts law the decision to transfer a prisoner by the Commissioner is a simple exercise of his administrative discretion made numerous times for varied reasons such as security, convenience, and rehabilitation. *Id.* at 228. See also *Lombardo* v. *Meachum,* 548 F.2d 13, 14-15 (1st Cir. 1977). The Commissioner's statutory authority is necessary to the proper functioning of the correctional system.

The plaintiff concedes that prison officials have broad discretion in transferring prisoners from one correctional facility to another. He argues, however, that the Commissioner's decision to transfer him was "in retaliation" for the fre-

quent litigation he has initiated against the Commissioner and other correctional officials and that, but for the exercise of this constitutional right, the Commissioner would not have ordered his transfer.[4]

The plaintiff's contention, though, is belied by the record and the findings of the special master. The special master found that the Commissioner and the special board made a full, conscientious review of Jackson's whole record and made their decision in good faith. The special master perceived no indication in the record that the Commissioner or any member of the special board entertained any improper bias against Jackson or that they attempted to retaliate against him for action of any type.

Similarly, our review of the record reveals no evidence that the decision to transfer Jackson was motivated in any way by Jackson's exercise of any constitutional rights. In its report, the special board stated that its recommendation that Jackson be returned to the maximum security prison at M.C.I. Walpole was based on consideration of Jackson's whole record including his institutional behavior and his prior criminal history. The Commissioner in reviewing and approving the special board's recommendation gave primary consideration to: (1) the serious criminal offenses for which Jackson had been convicted and their aggressive and grossly objectionable character; (2) Jackson's long criminal record and history of peculiar conduct and lack of stability; (3) the length and consecutive nature of many of the sentences Jackson is serving which makes it unlikely that he will ever be released and which provides a strong incentive for escape, and (4) the potential risks to the public in the event of Jackson's escape from a medium security institution. We agree fully with the special master's conclusion that the Commissioner's decision that this maximum security prisoner should be confined in a maximum security prison was made in good faith and was a reasonable exercise

---

[4] The plaintiff admits to being a "chronic litigator" and the defendants have stipulated to this fact.

by the Commissioner of his statutory power to determine where Jackson should be placed in the prison system.[5]

2. The plaintiff next argues that the decision to transfer him back to M.C.I. Walpole was improper because it was based on his being found guilty of two disciplinary infractions at a disciplinary hearing that was procedurally defective. However, while it is true that the August 23, 1979, classification hearing was convened as a result of the two disciplinary reports, the plaintiff's argument ignores the effect of the Commissioner's order on October 31, 1979, that a special board determine the "particular level of security that is necessary and appropriate for Jackson" after evaluating his over-all record. In his order the Commissioner stated that "consideration should be given to any recent disciplinary reports, but such reports generally should only be part of the overall evaluation of the inmate."

The special master found, and we agree, that the August 23, 1979, classification hearing was superseded by the new hearing, essentially de novo, ordered by the Commissioner and the Commissioner's own review of Jackson's record. In this new hearing the effects of the disciplinary reports and hearing were greatly reduced in significance to merely part of Jackson's whole record. The Commissioner, in testimony before the special master, stated that he gave some attention to these disciplinary reports but he treated them only as another instance of Jackson's "aggressive behavior." The Commissioner gave primary consideration to the length and consecutive character of Jackson's sentences and the seriousness of his offenses. Thus, the disciplinary reports were

---

[5] The plaintiff also argues that the classification hearings were procedurally defective, alleging that the Department of Correction failed to comply with its regulations for these hearings by not giving him access to his file or assisting him in reviewing it. The special master reviewed the classification hearings and found that the department did comply with its regulations. He noted that Jackson was represented by counsel before and during the hearings and there was no suggestion that Jackson did not have access to and knowledge of his institutional file. The special master stated that, if there were any error, it was harmless. We perceive no reason to disturb the special master's conclusion.

largely irrelevant to the decision to transfer Jackson and he suffered no prejudice from any procedural defects which may have occurred at that hearing.

3. Finally, the plaintiff contends that the decision to transfer him back to M.C.I. Walpole was made without proper consideration for his safety. The defendant fears that because of his criminal convictions for sex crimes and his role as an informant against another inmate he will be subject to violent attack if he is returned to Walpole. The special master found, however, that the Commissioner "gave careful consideration to Jackson's safety and to his protection on a continuing basis." The special master further found the Commissioner "clearly recognizes Jackson's special security needs and that it will be important to investigate (before any actual transfer of Jackson) the then placement of Jackson's currently known 'enemies' in the prison system" and to ascertain, "so far as possible, the identity and placement of other possible enemies. The Commissioner recognized also the necessity of keeping track of Jackson's enemy problem and of being prepared to move him promptly if and when new risks to him are ascertained."

The Commissioner's decision clearly reflects an appreciation for Jackson's safety at M.C.I. Walpole. The special master found that the first floor of Block B-9, the proposed area to which Jackson is to be transferred, is the safest protective custody area in M.C.I. Walpole. Given these considerations, and the special master's recommendation that the Commissioner investigate the files of the other nine inmates who will be confined on the first floor of Block B-9, the special master concluded that the Commissioner's reasons for transferring Jackson were sufficiently significant in comparison with any increased risk to Jackson to bring the Commissioner's decision well within the range of reasonable exercise of his statutory discretion. Our review of the record substantiates this conclusion. Accordingly, we affirm the judgment by the single justice confirming the special master's report.

*Judgment affirmed.*