Cowin, J.
The pro se plaintiff, James E. Lyman, Jr. (Lyman) brought this action for declaratory relief and monetary damages as a result of a denial by the *60 Department of Correction (DOC) of Lyman’s transfer from medium to minimum security classification. Defendants move for partial dismissal and partial summary judgment and plaintiff moves for summary judgment.
Based upon the pleadings, submissions and arguments of the parties, it is clear that the facts in this case are not disputed. Accordingly, I am adjudicating the matter on summary judgment and a declaration of the rights of the parties will be made.[3]
BACKGROUND
The following facts are drawn from the first amended complaint (amended complaint). On October 29, 1987, Lyman was convicted after trial on two indictments charging rape of a child by force. He was sentenced to two consecutive sentences of not less than twelve nor more than fifteen years in state prison. At his initial classification hearing, Lyman was told that he would be eligible for parole in sixteen years and that after he had served eight years of his sentence, as long as he had maintained a good institutional record, he would be placed in a minimum security facility.
Subsequent to Lyman’s initial classification hearing, the Legislature, in 1990, directed the Commissioner of Correction to “develop a plan for a program of voluntary treatment services for sex offenders to be offered in facilities operated by the department of correction.” St. 1990, c. 150, §104. In October 1994, Commissioner of Correction Larry DuBois approved a policy for the treatment and movement of sex offenders from commitment to release (the sex offender treatment policy or the policy). 103 DOC §446.01. “While this program is voluntary for all identified inmates, no inmate identified as a sex offender shall be permitted to move beyond medium security without successfully completing all programs outlined [in] . . . this policy.” 103 DOC §446.07.[4]
The sex offender treatment policy defines “program failures” as “those inmates who refuse to participate or minimize with regard to their offense(s), and also those inmates who remain in denial of the offense(s).” 103 DOC §446.13.1. An inmate who has been determined to be a program failure “shall not be permitted to transfer to a lower security institution ...” Id.
Lyman maintains that he did not commit the crimes for which he was convicted and he “is still working [in the appellate courts] to overturn his convictions.” After a classification hearing on October 19, 1995, defendants BSCC Director of Classification Joan Lyons Milch (Milch), Correctional Officer Bonnie McWilliam (McWilliam) and Correctional Officer Michael Vermette (Vermette) recommended a denial of Lyman’s requested transfer from medium to minimum security. Defendant BSCC Deputy Superintendent Peter St. Amand (St. Amand), acting for BSCC Superintendent James Matesanz (Matesanz) denied Lyman’s appeal on October 24, 1995. Finally, defendant DOC Commissioner Larry DuBois (DuBois) denied Lyman’s appeal on October 31, 1995 on the basis of Lyman’s failure to participate in mandatory counseling.
A pro se complaint is to be read with leniency. Mmoe v. Commonwealth, supra, at 620. It appears that the amended complaintmakes the following claims: (1) the sex offender treatment policy violates DOC regulations setting forth the objectives of the classification system because it deprives sex offender inmates the opportunity to provide input for the classification decisions; (2) the sex offender treatment policy violates St. 1990, c. 150, §104, which directs the Commissioner of Correction to develop a plan for a voluntary treatment program; (3) the sex offender treatment policy somehow violates G.L.c. 30A, the Administrative Procedure Act; (4) Lyman’s civil rights were violated when his October 1995 request for transfer to minimum security was denied in accordance with the sex offender treatment policy requirement that such transfers can occur only upon successful completion of the program. Lyman’s civil rights claim invokes state and federal constitutional protections against self-incrimination, double jeopardy, ex post facto application of law, denial of equal protection, and the Massachusetts anti-discrimination statute, G.L.c. 151B. Lyman seeks declaratory relief on all four claims and, additionally, injunctive relief and consequential and punitive damages totaling $9.5 million with respect to his civil rights claim.
DISCUSSION
1. The claim against Governor Weld in his official capacity.
Lyman seeks declaratory relief against the Governor in his official capacity. Such relief is not available against the Governor, see Alliance, AFSCME/SEIU, AFL-CIO v. Secretary of Administration, 413 Mass. 377, at 377 n.1 (1992). When declaratory relief is sought against the Governor, dismissal is the appropriate remedy. Town of Milton v. Commonwealth, 416 Mass. 471, 475 (1993).
2. The claims against Governor Weld in his individual capacity and against, O’Toole, Matesanz, St. Amand, Milch, McWilliam and Vermette in their official and individual capacities.
This Court allows summary judgment if there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating both elements. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof *61 of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass 805 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat the motion." Pederson, supra at 17. The nonmoving party’s failure to prove an essential element of its case “renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991), citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
Lyman asserts claims against the various defendants both in their official and personal capacities. The predicate of both sets of claims is his contention that the DOC’s sex offender policy is unconstitutional. Since, as discussed below, I hold that the DOC policy is not unconstitutional and that therefore the plaintiff is not entitled to the declarations he seeks against the defendants in their official capacities, this disposes of the claims against the defendants in their individual capacities as well.
Lyman asserts claims for declaratory relief against O’Toole, Matesanz, St. Amand, Milch, McWilliam and Vermette in their official capacities. Lyman seeks a declaration concerning the constitutionality of the promulgation and implementation of the DOC regulations. Apparently, Lyman does not contest the manner in which his classification hearing was held or seek judicial review of the denial of his appeal from that hearing. The amended complaint indicates that the sole basis for his contention that his hearing was illegal and that his appeal was wrongly denied is that these determinations were made pursuant to an unconstitutional policy.
Lyman asserts several reasons why the sex offender policy is unconstitutional. Only one reason merits full discussion: Lyman’s contention that the sex offender treatment policy violates his privilege against self-incrimination under the Fifth Amendment and Article 12 of the Massachusetts Declaration of Rights. Lyman asserts that he is currently seeking to reverse his convictions.[5] If he must confess his guilt in order to participate in the program, such confession would be admissible against him at any subsequent trial or appeal. 103 DOC §446.13; 103 DOC §446.08.1.0.4.
The defendants contend that the policy does not violate Lyman’s privilege against self-incrimination. They argue that his “testimony” is not compelled since prisoners can refuse to participate in the program. See: Knowles v. Warden, N.H. State Prison, 140 N.H. 387 (1995) and Russell v. Eaves, 722 F.Supp. 558, 560 (E.D.Mo. 1989), cf. Mace v. Amestoy, 765 F.Supp. 847, 850-52 (D. Vt. 1991), and State v. Imlay, 249 Mont. 82 (1991).
The policy at issue is not unconstitutional based upon an analysis of the history of the doctrine of unconstitutional conditions. That doctrine was recently defined in Louisiana Pacific Corporation v. Beazer Materials & Services, Inc., 842 F.Supp. 1243 (E.D. Cal. 1994):
The doctrine of unconstitutional conditions provides that the Government cannot condition the receipt of a government benefit on waiver of a constitutionally protected right. It functions to insure that the Government may not indirectly accomplish a restriction on constitutional rights which it is powerless to decree directly. Perry v. Sindermann, 408, U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
The doctrine originated in Barron v. Burnside, 121 U.S. 186 (1887), in which the United States Supreme Court stated that:
constitutional guarantees, so carefully safeguarded against direct assault, [should not be] open to destruction by the indirect but no less effective process of requiring a surrender which, though in form voluntary, in fact lacks none of the elements of compulsion . . .
Although the doctrine emerged in Barron v. Burnside, supra, and came to fruition in the Supreme Court’s “freedom of contract” decisions of the 1930s,[6] the doctrine of unconstitutional conditions has developed in the context of the First Amendment guarantees of free speech and free exercise of religion. For instance, the United States Supreme Court has held that public employees and independent contractors cannot be terminated because they have expressed unpopular political views or taken part in unpopular political associations. Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 116 S.Ct. 2342 (1996); Blackburn v. Marshall City Of, 42 F.3d 925 (5th Cir. 1995); Gini v. Las Vegas Metropolitan Police Department, 40 F.3d 1041, 1045 (9th Cir. 1994); Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), reh’g denied 497 U.S. 1050; Speiser v. Randall, 357 U.S. 513, 518-19 (1958). In Blackburn, the Fifth Circuit Court of Appeals stated:
It is well established that “even though a person has no ’’right" to a valuable government benefit, and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially his interest in freedom of speech.
Id. at 931, quoting Perry v. Sindermann, 408 U.S. 593, 597 (1972).
In a similar fashion, the federal courts have held that the doctrine of unconstitutional conditions mandates that a person cannot be deprived of a benefit by the government for reasons related to the exercise of his or her religion. See, e.g. Hobbie v. Unemployed Appeals Commission, 480 U.S. 136, 140-41 (1987) *62 (employee who refused to work on Sabbath could not be denied unemployment benefits); Thomas v. Review Bd. of the Ind. Unemployment Sec. Div., 450 U.S. 707, 717-18 (1981) (employee who for religious reasons refused to manufacture military equipment could not be denied unemployment benefits); Sherbert v. Verner, 374 U.S. 398 (1963) (public employee who refused to work on Sabbath could not be terminated).
In all these cases, the benefit that the government offered the employee was a voluntary benefit that the government was not constitutionally obligated to provide. Tipton v. University of Hawaii, 15 F.3d 922, 926 (9th Cir. 1994); Scothorn v. State of Kansas, 772 F.Supp. 556 (D.Kan. 1991). Even so, the conditioning of l he benefit upon the waiver of First Amendment rights was determined to be unconstitutional.
The doctrine of unconstitutional conditions has seldom been applied under that nomenclature outside the First Amendment context, and, in fact, has been described as “somewhat eroded” by a leading commentator. Lawrence Tribe, American Constitutional Law §10-8 at page 681 (2nd ed. 1988). The United States Supreme Court’s recent reliance on the doctrine, however, demonstrates its continued utility. See Rutan, v. Republican Party of Illinois, 497 U.S. 62, 72 (1990). In Louisiana Pacific Corp. v. Beazer Materials & Services, Inc., supra, a judge applied unconstitutional conditions law where the government conditioned a settlement offer for hazardous waste cleanup liability on the waiver of the due process right to judicial review. The Court acknowledged that:
The occasions when the doctrine is applied and when it is not are difficult to predict . . . Moreover, despite its venerable age, the jurisprudence concerning the doctrine of unconstitutional conditions is both underdeveloped and uncertain; indeed it has been described as a “doctrine in search of a theory.” . . . What the recent academic examination . . . has made plain is that, although there is a uniformly felt need for doctrine constraining indirect governmental pressure on the exercise of consi itutional rights, no easy or perhaps single rationale for application of the doctrine exists.
Id. at 1248-49.
The doctrine has once been applied to the Fourth Amendment.[7] In Wyman v. James, 400 U.S. 309 (1971),[8] a constitutional attack was made on a welfare regulation that required recipients to consent to in-home visits by social workers as a condition upon the receipt of their benefits. The Supreme Court permitted (he practice, relying on the fact that the in-home visits were not as intrusive or serious as the criminal justice searches contemplated in traditional Fourth Amendment jurisprudence.
A review of the United States Supreme Court’s cases indicates that when the unconstitutional conditions doctrine is applied, the Court weighs the following factors: the importance of the constitutional right involved; the value of the benefit offered; the propriety of the government discouraging exercise, of the constitutional right; and the effect of the government’s practice on public policy. Id. at 1249; Kathleen Sullivan, Unconstitutional Conditions, 102 Ilarv.L.Rev. 1415 (1989); Cass R. Sunslein, Is There An Unconstitutional Conditions Doctrine?, 26 San Diego L.Rev. 337 (1989).
The Court has not located any case, nor has one been provided by the parties, in which the doctrine of unconstitutional conditions has been applied by the Massachusetts appellate courts.[9] Nevertheless, that doctrine is useful for analyzing the present situation. The plaintiff here is being asked to give up his constitutional right not to incriminate himself. By exercising this right he gives up the ability to move from medium to minimum security. Thus, the policy that the government imposes here is one designed to assist and rehabilitate sex offenders. It represents a policy assumption by the regulators that recognition of the commission of the crime is essential to rehabilitation. That policy is not the governmental use of a policy to manipulate the plaintiff into giving up his right of free speech. The admission of guilt is a well-recognized and acceptable component of this program. There is no indication that this component has been adopted arbitrarily. Thus, this is not a situation in which the government is simply attempting to develop an ulterior means of defeating a constitutional right. If plaintiff insists on preserving his right against self-incrimination, it is not a large burden to give up the benefit of moving to a less secure institution. This is not the equivalent of giving up welfare benefits; the benefit granted Lyman is not as basic a need as that for employment, unemployment benefits or welfare subsistence benefits. An inmate normally would prefer to be housed in minimum security rather than maximum security. However, this preference is not so strong that the denial of a transfer to minimum security should be deemed a form of coercion. In minimum security, the defendant’s freedom is still denied, although everyday living conditions may be marginally better.
Although the constitutional right granted Lyman is a fundamental and necessary predicate for him to receive a fair new trial, if one is granted, the waiver of the right that is a prerequisite to Lyman’s entrance into the sex offender treatment program is supported by Massachusetts public policy. The Commonwealth has a strong interest in rehabilitating Lyman, an interest that Lyman shares if he is to return to productive community life outside prison. Furthermore, the Commonwealth’s strong interest in reducing recidivist crimes is fulfilled by the use of therapeutic programs such as the sex offender program. The transaction that Lyman attacks as an unconstitutional condition is not a transaction of the type contemplated in the Supreme Court’s First Amendment cases: a deliberate, offensive effort to invade a citizen’s constitutional rights that produces benefits that are *63 in the state’s political interest but are unsupported or even opposed by public policy. Here, the exchange is more properly described as an advancement of legitimate public policy goals that has the incidental effect of burdening the defendant’s rights under the Fifth Amendment. Accordingly, I conclude that the DOC sex offender treatment policy does not present an unconstitutional condition.
I recognize that at least one judge of the Superior Court has reached a different result on a very similar issue. See Latimore v. Massachusetts Parole Board, Lauriat, J., (Suffolk Civil Action No. 94-4807-G, November 29, 1995). In that case, the Court ruled that the Parole Board’s decision to deny parole based in part on Lyman’s failure to take responsibility for the crime of which he was convicted violated Latimore’s right against self-incrimination secured by the Fifth Amendment and Article 12. Latimore, however, dealt with the giving up of parole: release from prison. The present case involves only movement within the prison system. Lyman is not being deprived of his freedom because of the policy provisions.
As to Lyman’s other constitutional claims against the policy, his assertion that the policy violates state and federal guarantees against ex post facto laws is without merit. Ex post facto laws encompass every law that inflicts a greater punishment than the law imposed for the same crime when it was committed. See Dominique v. Weld, 73 F.3d 1156, 1162 (1st Cir. 1996). However, the ex post facto clause pertains only to “punishments inflicted,” Martel v. Fridovich, 14 F.3d 1 (1st Cir. 1993), in other words, to statutes that are penal in nature. Commonwealth v. Fourteen Thousand Two Hundred Dollars, 421 Mass. 1, 6 (1995). The sex offender treatment policy at issue in this case has been determined by the First Circuit Court of Appeals to be essentially remedial and not punitive in nature. “(U)nless and until [a sex offender] successfully completes the prescribed treatment program and admits to a crime he has continually denied, he must remain confined at no less than a medium security facility and remain ineligible for privileges associated with lower security imprisonment.” Dominique, supra at 1162. The changes in conditions occasioned by the policy are a permissible alteration in the prevailing “legal regime” rather that an “increased punishment,” in that such changes do not affect the length of a prisoner’s sentence or his parole options. Id. at 1163.
Lyman’s claim that the policy violates the equal protection clause because it results in a bias against prisoners convicted as sex offenders is also baseless. The distinction between sex offender inmates and other inmates, in terms of classification, is subject to the rational relationship test in which inquiry is limited to whether the challenged distinction rationally furthers a legitimate, articulated state purpose. McGuinnis v. Reyster, 410 U.S. 263, 270 (1973; McNeil v. Commissioner of Correction, 417 Mass. 818, 827 (1994). The sex offender treatment policy satisfies the “rational basis” test because no suspect classification is involved and the policy of denying lower security placement to those who refuse to participate in the program serves the legitimate state interests of rehabilitating offenders and protecting community safety. Albany v. Fridovich, 862 F.Supp. 615, 621 (D.Mass. 1994). See also Mahfouz v. Lockhart, 826 F.2d 791, 794 (8th Cir. 1987) (the state’s decision to distinguish sex offenders as a group from other inmates and exclude them from the work release program is rationally related to the legitimate government purpose of preventing sex crimes and thus does not violate the equal protection clause).[10]
Lyman’s assertion that his constitutional right against double jeopardy was violated also fails. The double jeopardy clause of the Fifth Amendment to the United States Constitution protects against a second prosecution for the same offense and multiple punishments for the same offense. Commonwealth v. Cerveny, 373 Mass. 345 (1977). Lyman was not tried again for the same offense at his classification hearing. The fact of his conviction for forcible rape was noted in order to determine whether he should be identified as a sex offender for classification purposes. See 103 DOC §446.08.1.A. Application of the policy “does not affect the length of [the inmate’s] sentence or his parole options.” Dominique v. Weld, supra, at 1163.
Since the defendants’ actions were discretionary, see Jackson v. Commissioner of Correction, 388 Mass. 700, 703 (1983) (Commissioner has broad discretion to transfer and to place inmates confined within the correctional system), and did not violate a constitutional principle, a fortiori they did not violate a “clearly established” constitutional right, and qualified immunity applies. Matthews v. Rakiey, 38 Mass.App.Ct. 490, 497 (1995). “Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, to the extent that Lyman’s amended complaint contains claims against the defendants in their individual capacities, the doctrine of qualified immunity shields them from liability.[11] The complaint contains no allegations that the defendants in some manner maliciously manipulated an otherwise constitutional policy to the plaintiffs detriment. The plaintiffs entire claim is that the policy is unconstitutional. Accordingly, having found the policy to be constitutional, nothing remains to support the claims against the defendants personally.
Lyman asserts a claim under G.L.c. 151B. As pleaded, his claim does not state a cause of action and therefore is to be dismissed. G.L.c. 15IB enumerates a variety of unlawful situations. Lyman fails to specify *64 what illegality has been committed that would be encompassed by this chapter. [12]
A declaration will issue that the sex offender treatment policy does not violate Lyman’s rights. G.L.c. 30A; St. 1990, c. 150, §104. Lyman’s amended complaint seeks review of the sex offender treatment policy and is properly brought under the Declaratory Judgment Act against DuBois. Injunctive and declaratory relief “should be directed toward responsible officials rather than generally against the Commonwealth” or any department. Lane v. Commonwealth, 401 Mass. 549, 553 (1988). Since the sex offender treatment policy violates no constitutional or statutory rights, DuBois is entitled to a declaratory judgment in his favor. Williams v. Secretary of the Executive Office of Human Services, 414 Mass. 551, 570 (1993) (“In declaratory actions, even where relief is denied, the rights of the parties must be declared”).
Regarding Lyman’s claim that the policy violates St. 1990, c. 150, §104, the policy is voluntary and not mandatory as sex offenders are not literally forced to participate. 103 DOC §446.07. A declaration will issue that the policy does not violate St. 1990, c. 150, §104, the Legislature’s directive that the Commissioner “develop a plan for a program of voluntary treatment of sex offenders to be offered in facilities operated by the Department of Correction.”
To the extent that Lyman’s complaint seeks relief against Governor Weld personally, Lyman’s complaint states only that the Governor “mandated” the sex offender treatment policy.[13] As I have concluded that the policy is constitutional, the Governor has no liability for mandating the policy. Summary judgment is to enter for the Governor.[14]
Since I have determined that the policy is constitutional, O’Toole did not violate Lyman’s rights by failing to prevent the adoption of the policy. The only allegation made in the amended complaint regarding Matesanz and St. Amand is that they denied Lyman’s appeal in violation of his constitutional rights. Since the policy is constitutional, Matesanz and St. Amand did not violate Lyman’s rights by refusing to reverse the classification decision. Furthermore, Milch, McWilliam and Vermette did not violate Lyman’s rights when they made their decision at his initial classification hearing to deny his request to be transferred to minimum security.[15]
As to Lyman’s c. 30A claim, the sex offender treatment policy is not a “rule, regulation, standard or other requirement of general application and future effect.” G.L.c. 30A, §1(5). The policy has no general effect: its effect is restricted to a small sub-group of the prison population. Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162, 170-71 (1989); Dept. of Public Health v. Cumberland Cattle Co., 361 Mass. 817, 828-29 (1972); Associated Industries of Massachusetts v. Commissioner of Insurance, 356 Mass. 279, 282-84 (1969). The policy is merely an aid to prison personnel in the exercise of their discretion as permitted by statute. G.L.c. 124 §1, et seq., Dougan v. Commissioner of Correction, 34 Mass.App.Ct. 147, 148-49 (1993). The policy consists of a description of the therapeutic methods used in the rehabilitation and treatment of convicted sex offenders and psychological standards intended to guide corrections officials when they recommend changes to inmates’ classification based on those inmates’ participation in sex offender treatment.
The policy is comparable to the State Police policies concerning roadblocks that the Supreme Judicial Court determined to be “guidelines” rather than “regulations” in Commonwealth v. Trumble, 396 Mass. 81, 88-89 (1985). Like the roadblock guidelines, the sex offender treatment policy is directed solely towards corrections personnel and is intended to instruct them in the manner in which they perform their duties. Id. at 88. The policy concerns only the internal management of the corrections system; although its recommendations can affect the classification of inmates, the policy does not attempt to regulate the conduct of the inmates that it concerns. Id. at 89. The policy is therefore not a regulation, but instead an “advisory or informational pronouncement by an administrative agency that may be issued lawfully . . . without going through the procedures required for promulgation of a regulation.” Id. at 88 n.6, quoting Massachusetts Gen. Hosp. v. Rate Setting Comm’n, 371 Mass. 705, 706-07 (1977). Consequently, the Commissioner is entitled to a declaration that the policy is not a regulation that is subject to the formal requirements for promulgation.
ORDER
It is hereby ordered that the motion to dismiss of defendant Governor William Weld is allowed as it applies to Governor Weld in his official capacity as Governor. Summary judgment is to enter for Governor Weld in his individual capacity and for the remainder of the defendants: Secretary of Public Safety Kathleen O’Toole, Commissioner of Correction Larry Dubois, Bridgewater State Correctional Center (BSCC) Superintendent James Matesanz, BSCC Deputy Superintendent Peter St. Amand, BSCC Director of Classification Joan Milch, BSCC Correctional Program Officer Bonney McWilliam, and BSCC Correctional Officer Michael Vermette and the Department of Correction. A declaration is to enter that the sex offender treatment policy does not violate (a) a clearly established constitutional right; (b) the plaintiffs constitutional rights; and (c) St. 1990, c. 150, §104. A further declaration is to enter that the sex offender treatment policy is not a regulation that is subject to the formal requirements of G.L.c. 30A for promulgation. The plaintiffs requests for injunctive relief are denied.

 dhis is true except for the claim against the Governor, William Weld, in his official capacity. This claim against the Governor will be dismissed. See infra.

 Since plaintiffs complaint refers a number of times to various provisions of the sex offender treatment policy, the Court is treating the entire policy as incorporated by reference into the complaint. See Mmoe v. Commonwealth, 393 Mass. 617, 620 (1985).

 Lyman does not provide a citation for his appellate cases. He simply states that he is “still working to overturn his convictions” both in the Appeals Court and the Supreme Judicial Court. The Commonwealth does not contest this assertion.

 See, e.g., Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583 (1926) (legislation imposing common-carrier liability upon a private carrier as a condition of using the highways an unconstitutional condition).

 Note also that, in Schneckcloth v. Bustamante, 412 U.S. 218, 288 n.12. (Marshall, J., dissenting) (1973), the dissent advocated the application of the doctrine to the Fourth Amendment situation.

 Wyman has received criticism: one federal circuit criticized the Supreme Court’s reasoning in the case and contended that the lack of use of Wyman as a precedent indicated that the Court had limited the applicability of the opinion to its own “peculiar” facts. Zweibon v. Mitchell 516 F.2d 594, 632 n.94 (D.C. Cir. 1975), cert. denied 425 U.S. 944. Wyman has not been cited by Massachusetts state courts except as an example of the Supreme Court placing the interests of a child paramount over the interests of the child’s parents.

 However, the Supreme Judicial Court may have utilized a similar analysis without using the term “unconstitutional condition” in determining whether a death penalty statute violated the right against self-incrimination. See Commonwealth v. Colon-Cruz, 393 Mass. 150, 170-72 (1984) (death penalty statute unconstitutional because it needlessly chilled defendant’s Article 12 right to a trial by jury and his right against self-incrimination).

 The Court has some concern about the lack of any record evidence about the factual basis for the distinction between sex offenders and other prisoners. Itwould have been preferable if the government had at least presented to the Court some factual underpinnings in this regard. Nevertheless, in view of the fact that the government action here at issue is pursuant to a legislative act, it is entitled to the presumption of validity. See Druzik v. Board of Health of Haverhill, 324 Mass. 129, 138-39 (1949). Further, given the apparently accepted principle that sex offenders may be treated differently from other offenders, I am not prepared to declare the policy invalid.
I note that the Attorney General argues that the defendants should not be susceptible to damages in any event. In view of my disposition of the issue, I do not reach the matter of damages.

 The Supreme Judicial Court has adopted the Harlow standard as the rule applicable to state officials’ assertions of qualified immunity under the Massachusetts Civil Rights Act, G.L.c. 12, §§11H-1II. Duarte v. Healy, 405 Mass. 43, 46-47 (1989). The Harlow standard also applies in federal civil rights actions under 42 U.S.C. §1983. Davis v. Scherer, supra.

 Because of this resolution of the matter, the Court need not address the issue of whether Lyman initially filed his discrimination claim with the Massachusetts Commission against Discrimination (MCAD), a jurisdictional prerequisite to the Superior Court hearing plaintiffs claim. See G.L.c. 151B, §9.

 It is likely that the Governor did not “mandate” the policy in view of the fact that a statute directs the Commissioner of Correction to develop a treatment plan for sex offenders. The Legislature appears to have mandated the policy. That issue need not be adjudicated, however, in view of the resolution of the claim against the Governor.

 It is not entirely clear that the allegation against the Governor is sufficient to withstand the motion to dismiss. However, given the disposition of the case, it is not necessary to resolve the issue on that procedural nicety.

 Lyman also alleges that Milch violated his rights when she denied his request to show him a copy of the sex offender treatment policy “for security reasons” and then refused to tell him what those security reasons consisted of (Amended complaint ¶18). Since I conclude that the sex offender treatment policy is constitutional, and that none of Lyman’s rights were violated when his transfer request was denied, I also conclude that Lyman’s claim against Milch is now moot. Lyman fails to show that Milch’s denial of his request injured him in any way.

 defendants Governor William Weld, Secretary of Public Safety Kathleen OToole, Commissioner of Correction Larry DuBois, Bay State Correctional Center (BSCC) Superintendent James Matesanz, BSCC Deputy Superintendent Peter St. Amand, BSCC Director of Classification Joan Milch and BSCC Correctional Program Officer Bonney McWilliam are sued in their individual and official capacities. BSCC Correctional Officer Michael Vermette and DOC are sued in their official capacities. The individual defendants and DOC brought this motion to dismiss the complaint. Defendant Larry DuBois brought this motion for summary judgment.