## Commonwealth *vs.* Robert P. Murphy.

Norfolk. May 4, 2009. - July 23, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Constitutional Law,* Search and seizure, Roadblock by police. *Search and Seizure,* Automobile, Threshold police inquiry, Roadblock by police. *Motor Vehicle,* Operating under the influence.

This court concluded that a State police general order (order) setting forth protocols and guidelines governing sobriety checkpoints conducted in Massachusetts to detect and deter drunk driving allowed a constitutionally permissible amount of discretion to the initial screening officers to select which drivers are diverted to secondary screening, where the guidelines permitted a vehicle to be diverted to secondary screening only when the officer has a reasonable suspicion, based on articulable facts, that the driver is operating while under the influence of alcohol or drugs or that the driver or any passenger has otherwise committed another violation of law [322-327]; further, this court concluded that the order, as supplemented by orders and instructions included in a sobriety checkpoint written operations plan and officer's directives specific to the roadblock at issue in this case, allowed a constitutionally permissible amount of discretion to the initial screening officers to question drivers when there was no indication of intoxication [327-329]; therefore, a trial court judge erred in granting a criminal defendant's pretrial motion to suppress evidence resulting from his seizure at that roadblock on the ground that the roadblock was not governed by lawful guidelines.

Complaint received and sworn to in the Quincy Division of the District Court Department on July 30, 2007.

A pretrial motion to suppress evidence was heard by *James J. McGovern,* J., and a motion for reconsideration was considered by him.

An application for an interlocutory appeal was allowed by *Botsford,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court. The Supreme Judicial Court granted an application for direct appellate review.

*Alexei Tymoczko,* Assistant District Attorney (*Carolyn L. Hely,* Assistant District Attorney, with him) for the Commonwealth.

*Lisa M. Kavanaugh*, Committee for Public Counsel Services, for the defendant.

*James M. Milligan, Jr.*, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

GANTS, J. The defendant was arrested at a roadblock established by the State police as part of a sobriety checkpoint program to detect and deter drunk driving (sobriety checkpoint), and charged with operating a motor vehicle while under the influence of alcohol, third offense, in violation of G. L. c. 90, § 24. The roadblock was conducted pursuant to State police General Order TRF-15 (TRF-15), which sets forth protocols and guidelines governing sobriety checkpoints conducted in Massachusetts, supplemented by orders and instructions specific to this roadblock included in a sobriety checkpoint written operations plan and officer's directives (operations plan). At the time of the defendant's arrest, TRF-15 allowed, but did not require, an officer who makes an initial stop of a vehicle at a sobriety checkpoint to divert the vehicle to a secondary screening area for further inquiry when the officer has a reasonable suspicion, based on articulable facts, that the driver is operating while under the influence of alcohol or drugs (OUI) or has committed another violation of law. A judge in the Quincy Division of the District Court Department allowed the defendant's motion to suppress evidence resulting from his seizure at the roadblock, concluding that the guidelines contained in TRF-15 are unconstitutional on their face because they permit "arbitrariness" in deciding which drivers stopped at the initial checkpoint will be directed to secondary screening.

The first question presented is whether TRF-15 allows a constitutionally impermissible amount of discretion to the initial screening officers to select which drivers are diverted to secondary screening. We conclude that TRF-15 falls within constitutional parameters, because its guidelines permit a vehicle to be diverted to secondary screening only when the officer has a reasonable suspicion, based on articulable facts, that the driver has committed an OUI violation or another violation of law. The second question presented is whether TRF-15 allows a constitutionally impermissible amount of discretion to the initial screening officers to question drivers when there is no indication of intoxication. We conclude that, as a result of the orders and instructions in the operations plan that governed this sobriety checkpoint and supple-

mented the guidance provided by TRF-15, the discretion provided to the initial screening officers in greeting motorists was appropriately limited to pass constitutional muster. Accordingly, we reverse the order allowing the motion to suppress and remand the case to the District Court for further proceedings.

*Facts.*[1] On July 27, 2007, a vehicle operated by the defendant, Robert P. Murphy, was stopped at a sobriety checkpoint operated by State police officers on Quincy Shore Drive, in Quincy. The roadblock detail began at exactly 11 P.M. on July 27 and ended at 3 A.M. on July 28. Seventeen uniformed State troopers took part in the roadblock. They were instructed to stop every vehicle as it approached the roadblock site, but to allow vehicles to pass through the roadblock without stopping if traffic became backed up to the safety officer's position.[2] Officers were told that the initial contact should be no more than one minute for each individual operator. During that brief period, the officers were to say: "This is a State Police sobriety checkpoint. We are checking all operators for sobriety." The officers were to look for clues of impaired operation, including the condition of the eyes of the operator, the odor of alcohol, the speech of the operator, alcohol in plain sight in the vehicle, and other indicators, which, if observed, were to be documented. If the officers saw no problems, they were to allow the vehicle to proceed.

TRF-15 governed the officers' conduct when such clues were observed. The relevant provision of TRF-15 in effect at the time of the defendant's arrest stated: "If there is reasonable suspicion, based upon articulable facts, that the operator and/or passenger(s) is committing or has committed an OUI violation or other violation of law, that vehicle *may* be directed from the normal flow of traffic and the offender(s) checked further" (emphasis added).[3] When an officer suspected that the operator had committed an

---

[1] We draw the facts of this case from a memorandum of law written by the District Court judge after a consolidated hearing addressing motions to suppress submitted by eleven defendants, including the defendant, Robert P. Murphy, who had been charged with alcohol-related offenses arising out of the same sobriety checkpoint in Quincy. The hearing was limited solely to the issue of the facial constitutionality of the roadblock guidelines.

[2] The safety officer, along with the safety vehicle, a police cruiser with flashing lights, stood at the beginning of the cones that were placed to slow and channel traffic into the sobriety checkpoint.

[3] The State police revised State Police General Order TRF-15 (TRF-15),

OUI violation, the officer was to instruct the operator to drive to a screening area. There, the operator would be asked to produce a driver's license and motor vehicle registration and to perform three field sobriety tests.

The operations plan governing this roadblock included written instructions issued on June 24, 2007, by Major Michael P. Concannon, the troop commander, to Captain Thomas Stewart, the officer charged with carrying out the roadblock. The instructions directed, among other things, that the planned roadblock "will be conducted in accordance with" TRF-15 and according to a written operations plan approved by Major Concannon. Paragraph eight of the written instructions specifies:

> "If the officer observes any articulable sign of possible intoxication, impairment or contraband, then further inquiry *should* be made at the area designated on the diagram. The operator of the motor vehicle shall be allowed to drive to the designated area at the direction of officers at the initial point unless extreme intoxication is evident and obvious." (Emphasis added.)

In allowing the defendant's motion to suppress, the judge considered TRF-15 and the written instructions from Major Concannon to Captain Stewart, and concluded that the roadblock's written operations plan "does not neutrally guide the initial point contact officer. Left to the discretion of a trooper are considerations such as gender, race, and economic status." In short, the judge reasoned, because TRF-15 and Major Concannon's written instructions use the word "may" (rather than "must") and "should" (rather than "shall"), there remains a constitutionally impermissible threat of "arbitrariness" in the manner in which motor vehicles are diverted to the secondary screening area.

effective April 23, 2009, to eliminate the apparent grant of discretion. The provision now reads:

> "If there is reasonable suspicion, based upon articulable facts, that the operator and/or passenger(s) is committing or has committed an OUI violation or other violation of law, that vehicle *shall* be directed from the normal flow of traffic and the offender(s) checked further" (emphasis added).

This revision, which became effective after the defendant's arrest in this case, has no bearing on our decision.

The Commonwealth moved for reconsideration and the judge, without a hearing, denied the Commonwealth's motion. The Commonwealth sought leave to file an interlocutory appeal pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), which was allowed by a single justice of this court and transmitted to the Appeals Court. We granted the Commonwealth's application for direct appellate review.

*Discussion.* Few would deny the strong public interest in keeping drunk drivers off the road. In *Michigan Dep't of State Police* v. *Sitz*, 496 U.S. 444 (1990) (*Sitz*), the Supreme Court recognized what was obvious then (and now) when it stated:

> "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion."

*Id.* at 451. See *Breithaupt* v. *Abram*, 352 U.S. 432, 439 (1957) ("The increasing slaughter on our highways . . . now reaches the astounding figures only heard of on the battlefield"); *Commonwealth* v. *Trumble*, 396 Mass. 81, 86 (1985) (*Trumble*), quoting *South Dakota* v. *Neville*, 459 U.S. 553, 558 (1983) (recognizing "carnage caused by drunk drivers").[4]

It is equally beyond question that the stop of a vehicle at a fixed roadblock, however brief, constitutes a warrantless seizure of that vehicle and its driver without individualized suspicion under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. See *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 556 (1976); *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 139 (1983). In determining whether such seizures are reasonable, we have recognized that we must balance the strong public interest in reducing the number of persons who die each year on our highways from alcohol-related accidents "against 'the individual's right to personal security free from arbitrary interference by law officers.' " *Trumble*, *supra* at 86, quoting *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

---

[4]In view of the particular public interest that applies to sobriety checkpoints, our analysis may not apply to roadblocks established for other law enforcement purposes.

Guided by Supreme Court case law, we have found that, for sobriety checkpoints to be reasonable under the Fourth Amendment and art. 14, "the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized, and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel." *Commonwealth* v. *McGeoghegan, supra* at 143. See *Commonwealth* v. *Anderson*, 406 Mass. 343, 347 (1989) (brief seizure of motorist at sobriety checkpoint established for purpose of detecting drunk drivers is "reasonable" under Fourth Amendment and art. 14 if "roadblock meet[s] standard, neutral guidelines").[5] Police officers may not, within the limits of the Fourth Amendment and art. 14, have discretion to target which vehicles to stop, such as in roving roadside checks, or fixed checkpoints in which cars are stopped according to no set pattern. See *Delaware* v. *Prouse*, 440 U.S. 648, 663 (1979); *Commonwealth* v. *Anderson, supra.* Because sobriety checkpoints, by their very nature, initially stop drivers without any individualized suspicion, giving police officers such discretion poses too high a risk that the discretion will be "standardless and unconstrained." *Delaware* v. *Prouse, supra* at 661. See *Commonwealth* v. *Shields*, 402 Mass. 162, 165 (1988). Instead, we have required that sobriety checkpoints be governed by standard, neutral guidelines that clearly forbid the arbitrary selection of vehicles to be initially stopped. See *Trumble, supra* at 89; *Commonwealth* v. *Anderson, supra* at 348-349.

In *Trumble, supra* at 82-83, we concluded that the written guidelines governing a sobriety checkpoint conducted by State police officers in 1983 on Route 116 in Sunderland did "make adequate provisions so as not to offend the guarantees" of the United States Constitution and our own Declaration of Rights. The guidelines we approved in the *Trumble* decision were adopted

---

[5]"Although the Massachusetts Declaration of Rights may afford greater protection to an individual than the protection afforded by the United States Constitution, see, e.g, *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648, 666-667 (1980); *Commonwealth* v. *Ortiz*, 376 Mass. 349, 358 (1978), the same factors are material to a consideration of the constitutionality under either document of a roadblock stop of motor vehicles for the purpose of detecting drunk drivers." *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 141 n.2 (1983).

almost verbatim as State Police General Order TRF-13 (*Trumble* guidelines), the predecessor guidelines to TRF-15. The *Trumble* guidelines provided that the "[s]election of vehicles to be stopped must not be arbitrary." *Id.* at 92 (Appendix). The supervisor of the sobriety checkpoint was empowered to decide whether all vehicles were to be stopped, or a "set number, i.e., (1) one of every ten passing cars." *Id.* at 93 (Appendix).[6] The guidelines governing secondary screening provided:

> "A. If after brief stop, the officer develops specific and articulable facts which lead the officer to believe the motorist may be intoxicated:
>
> > "1. Vehicle operator requested to drive onto the shoulder of road
> >
> > "2. Driver requested to produce license and registration
> >
> > "3. Driver may be requested to perform certain motor coordination tests."

*Id.* at 94 (Appendix).

The defendant argues that the *Trumble* guidelines required a police officer who reasonably suspected that a driver was intoxicated to request the driver to proceed to the shoulder of the road for secondary screening. The defendant contends that TRF-15 is unconstitutional because its guidelines provide that, once the initial screening officer has reasonable suspicion based on articulable facts that a driver is under the influence of alcohol, the officer "may" direct the driver to proceed to secondary screening, thereby vesting the initial screening officer with substantial discretion, beyond that approved in the *Trumble* case, to determine whether to subject a driver showing signs of impairment to the more significant intrusion of secondary screening. We conclude that this apparent grant of discretion in TRF-15 is constitutionally permissible.[7]

The constitutional jurisprudence regarding roadblocks in

---

[6]At the Sunderland roadblock, "troopers were instructed to stop every automobile that approached the site." *Commonwealth* v. *Trumble*, 396 Mass. 81, 90 (1985).

[7]The Commonwealth contends that this apparent grant of discretion in

general, and sobriety checkpoints in particular, has focused on the reasonableness of the initial stop of a vehicle, which constitutes a seizure without individualized suspicion. For such a suspicionless seizure to be reasonable, its "objective" intrusion, measured by the duration of the seizure and the intensity of the investigation, must be minimal, allowing only a brief window of a minute or two in which the officer may observe the driver for indicia of intoxication. See *Sitz, supra* at 452; *Trumble, supra* at 89-91. Its "subjective" intrusion on motorists, that is, "the fear and surprise engendered in law-abiding motorists by the nature of the stop," must also be minimal, which is why it must be apparent to a motorist that he or she is not being singled out for a stop and why police officer discretion in deciding whom to stop must be severely circumscribed by clear guidelines. See *Sitz, supra* at 452-453; *Commonwealth* v. *Anderson, supra* at 348.

Secondary screening, as permitted under TRF-15, in contrast, is not a seizure without individualized suspicion, because it must be predicated on reasonable suspicion, based on articulable facts, that the driver is operating while under the influence or that the driver or any passenger has otherwise committed a violation of law. For constitutional purposes, a driver directed to the secondary screening area has been stopped in accordance with principles set forth in *Terry* v. *Ohio,* 392 U.S. 1 (1968), under the familiar standard of "reasonable suspicion." See *Sitz, supra* at 451 ("Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard"); *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 561-563 (1976).[8] The only factor that distinguishes a secondary screening stop from the more traditional *Terry* stop on the roadway or

TRF-15 was eliminated by the State Police Division Commander's Order, dated May 10, 2007 (No. 07-DFS-056), which declared that the State police department had elected to adopt a "zero tolerance" enforcement policy for all highway safety programs, so that "if a person is observed committing a violation, and can be legally stopped, cited and/or arrested, [he] will be." The judge acknowledged this "zero tolerance" order, as well as a State police lieutenant's testimony that the order required further screening at a sobriety checkpoint once the initial screening officer detected the presence of any indication of intoxication, but did not find that the order limited the discretion of the initial screening officer. In view of our legal conclusion, we need not determine whether the judge erred in this finding.

[8]Addressing the constitutionality of a roadblock established by the Federal

sidewalk is that the information that gave rise to reasonable suspicion was obtained from observations made during the brief initial suspicionless stop at the sobriety checkpoint. As in any encounter between a police officer and a driver of a lawfully stopped vehicle, if the officer, during the brief window of time allowed by our cases, observes articulable signs of intoxication, then the officer may further detain the driver for a reasonable time to permit the officer's initial observations to be confirmed or dispelled.

We have never required an officer with reasonable suspicion to make a stop, or for that matter required an officer with probable cause to make an arrest. See, e.g., *Terry* v. *Ohio, supra* at 22 (recognizing that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"); *Commonwealth* v. *Bostock*, 450 Mass. 616, 622 (2008) (officer "may" issue, in appropriate circumstances, exit order to suspect in automobile); *Commonwealth* v. *Washington*, 449 Mass. 476, 486 (2007) ("it is clear that the police need not arrest a suspect the moment they obtain probable cause"); *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000) (officers "may" stop automobiles to conduct threshold inquiry). See also G. L. c. 276, § 28 ("Any officer . . . may arrest, without a warrant . . . a person found in the act of stealing property in the presence of the officer . . ."). We see no reason to require it when the stop comes in the form of secondary screening at a sobriety checkpoint. We shall evaluate the lawfulness of a secondary screening, or any *Terry* stop, based on whether the evidence supports the officer's finding of reasonable articulable suspicion, not on whether the police officer had the discretion, despite reasonable suspicion, to forgo or defer a *Terry* stop.

We acknowledge that allowing initial screening officers at sobriety checkpoints the discretion to determine whether to

___

border patrol to detect smuggling of illegal aliens, the Supreme Court in *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 563 (1976), declared that it may be constitutional to refer motorists to secondary screening on the basis of information that falls short of reasonable suspicion. We need not decide whether art. 14 of the Massachusetts Declaration of Rights requires reasonable suspicion to justify secondary screening because TRF-15 prohibits secondary screening in the absence of reasonable suspicion.

divert motorists they reasonably suspect to be intoxicated to secondary screening potentially could allow officers to misuse that discretion, as the judge feared, by selectively diverting motorists based on race, gender, or economic status. The risk that this discretion will be misused, however, is no different, and no greater, for *Terry* stops at sobriety checkpoints than for *Terry* stops on the street or the roadway.

The defendant also argues that the provision of TRF-15 regulating the brief initial encounter between officer and driver lacks sufficient guidance as to what an officer may or may not say, and, therefore, is constitutionally flawed. The judge did not address this argument in allowing the motion to suppress, but we address it here in view of the remand.

The *Trumble* guidelines provided detailed guidance to the initial screening officer as to what should be said when the motorist arrives at the sobriety checkpoint:

> "A. A very brief and courteous statement should be made by officers manning the checkpoints: Example — 'Good evening, this is a routine sobriety checkpoint. Sorry for the inconvenience, good night.'

> "B. Only upon observing an articulable sign of possible intoxication will further inquiry be warranted. In other words, the officer should develop at least an indication that the driver has been consuming alcohol before . . . engaging in conversation regarding the consumption of alcohol."

*Trumble, supra* at 93 (Appendix). These guidelines made it explicit that the initial screening officer may not ask whether the driver had been drinking without "at least an indication that the driver has been consuming alcohol."

For reasons unclear from this record, TRF-15 incorporated only the first half of this guidance, omitting the second half. The relevant provisions of TRF-15 provide that "[v]ehicles stopped at the checkpoint should be greeted for a period of one minute or less" and that "[a]ll contacts should be kept brief with a short greeting, such as 'Good evening, this is a State Police Sobriety Checkpoint. Sorry for the inconvenience, thank you." In short, TRF-15 limits the duration of the initial screening, and suggests

the greeting that should be used, but does not provide any guidance or any limitation on the questioning that may follow the greeting.

As noted earlier, however, TRF-15 was supplemented by written guidance in the operations plan that governed this roadblock. The written instructions issued by Major Concannon to Captain Stewart provided more detailed guidance to the initial screening officers:

> "Upon stopping a motor vehicle, the officer shall make a brief and courteous statement to the operator of the motor vehicle, such as 'Good Evening, this is a State Police Sobriety Checkpoint, we are checking all operators for sobriety.' If the officer observes any articulable sign of possible intoxication, impairment or contraband, then further inquiry should be made at the area designated on the diagram [the secondary screening area]."

Under these written instructions, the initial screening officer is permitted simply to give the suggested greeting and is not allowed to make any inquiry regarding drinking; any such inquiry is to be conducted at the secondary screening, which under TRF-15 requires a predicate of reasonable articulable suspicion based on the observations of the initial screening officer (e.g., red eyes, slurred speech, container of alcohol in plain view), or information volunteered by the driver or passengers. While it would be clearer if this additional guidance were found within TRF-15 rather than in a separate written directive governing the particular sobriety checkpoint, Major Concannon's written instructions may be considered part of the written guidance that governed the operation of this sobriety checkpoint. The inquiry permitted by the initial screening officer under these instructions is less intrusive to the motorist than the inquiry we allowed under the *Trumble* guidelines, and therefore plainly passes constitutional muster.[9]

We conclude that the Commonwealth has satisfied its burden

---

[9]We recognize that, according to the activity log for this sobriety checkpoint, the reason given by the initial screening officers, at least in part, for diverting twenty-one of the thirty-three automobiles that were directed to secondary screening was "admission" to drinking alcohol. We have required strict compliance with the written guidelines governing roadblocks, and have sup-

of establishing that the roadblock in this case was governed by lawful guidelines. See *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 144 (1983), citing *Commonwealth* v. *Leone*, 386 Mass. 329, 336 (1982), and *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974).

*Conclusion.* The order allowing the defendant's motion to suppress is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.[10]

*So ordered.*

---

pressed evidence obtained from a sobriety checkpoint stop that occurred fifteen minutes after the roadblock was scheduled to terminate. See *Commonwealth* v. *Anderson*, 406 Mass. 343 (1989). See also *Commonwealth* v. *Shields*, 402 Mass. 162, 164-165 (1988) (Commonwealth must prove adherence to guidelines to meet its burden of proving that seizure was reasonable). We know that this decision resolves only part of the motion to suppress filed by the defendant, because he has also reserved his right to challenge whether the written guidelines governing the Quincy roadblock were, in fact, adhered to during the sobriety checkpoint. We, therefore, leave to the judge the factual question whether the initial screening officer who stopped the defendant made inquiry of him that exceeded the parameters established in Major Concannon's directive.

[10]We are aware that other cases involving this same roadblock are pending in District Court awaiting the resolution of the facial constitutional issues in this case.