NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-771                                            Appeals Court


COMMONWEALTH  vs.  ROBERT S. EMERTON.


No. 17-P-771.


Suffolk.     December 1, 2017. - October 31, 2018.

Present:  Agnes, Blake, & McDonough, JJ.


Practice, Criminal, Motion to suppress.  Constitutional Law,
    Search and seizure, Roadblock by police.  Search and
    Seizure, Motor vehicle, Roadblock by police.  Motor
    Vehicle, Operating under the influence.


    Complaint received and sworn to in the Brighton Division of
the Boston Municipal Court Department on May 16, 2016.

    A pretrial motion to suppress evidence was heard by Myong
J. Joun, J.

    An application for leave to prosecute an interlocutory
appeal was allowed by David A. Lowy, J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.

    Sarah Montgomery Lewis, Assistant District Attorney, for
the Commonwealth.
    Francis M. Doran, Jr., for the defendant.


    AGNES, J.  The defendant, Robert S. Emerton, was charged

with operating a vehicle while under the influence of alcohol

(OUI), fourth offense, after he was arrested at a sobriety checkpoint on Soldiers Field Road in the Brighton section of Boston. On October 11, 2016, the defendant filed a motion to suppress evidence, arguing that the roadblock was not carried out in accordance with constitutional requirements. A judge of the Brighton Division of the Boston Municipal Court Department allowed the defendant's motion to suppress, reasoning that the roadblock was unlawful because there was insufficient data to justify the selection of the site, date, and time of the roadblock. A single justice of the Supreme Judicial Court allowed the Commonwealth's petition for interlocutory review and transferred the matter to this court. The Commonwealth argues that the roadblock complied with State police policy and otherwise met the requirements of the governing case law. We agree and, accordingly, reverse the order of suppression.

Background. The following facts are drawn from the judge's findings of fact and other undisputed evidence offered at the hearing on the defendant's motion to suppress. Between the hours of 11:30 P.M. on Saturday, May 14, 2016, and 3 A.M. on the morning of Sunday, May 15, 2016, members of the State police conducted a "sobriety checkpoint" along Soldiers Field Road in Brighton, opposite the Artesani Park parking lot at Everett Street, in order to detect drivers impaired by the consumption of alcohol. This location is about halfway between Harvard

Stadium and Western Avenue. Captain Richard Ball, who was the officer in charge of the checkpoint and was certified to perform such a role, designed the plan for the checkpoint in accordance with instructions from his commanding officer. At the motion hearing, Captain Ball explained that under State police policy, the commanding officer of the State police troop in question reviews data from the prior two years compiled by another officer concerning alcohol-related arrests throughout the area patrolled by the troop and then makes a selection of the site for the sobriety checkpoint. In this case, Captain Ball's commanding officer followed that procedure and selected Soldier's Field Road at Artesani Park as the location for the roadblock.

Captain Ball also testified that he consulted State police General Order TRF-15 (effective April 23, 2009) (TRF-15), which governs the policies and procedures for conducting such checkpoints.[1] As the officer in charge, Captain Ball prepared

---

[1] State police General Order TRF-15 has been examined in several recent appellate court decisions. See, e.g., Commonwealth v. Swartz, 454 Mass. 330 (2009); Commonwealth v. Murphy, 454 Mass. 318 (2009); Commonwealth v. Baker, 91 Mass. App. Ct. 445 (2017); Commonwealth v. Bazinet, 76 Mass. App. Ct. 908 (2010).

In Murphy, supra at 319-320, the Supreme Judicial Court determined that an earlier version of TRF-15 that, unlike the present version, allowed but did not require the initial screener to refer drivers to secondary screening if they appeared to be impaired met constitutional requirements:

certain documents to guide the members of the State police assigned to staff the sobriety checkpoint that is the subject of this case.  These documents, collected in the Written Operations Plan & Officer's Directives, were received in evidence and marked as exhibits.[2]

In his testimony, Captain Ball explained how sobriety checkpoints are carried out by the State police.  Vehicles traveling on the roadway where the checkpoint is established first encounter a marked police cruiser with its emergency

---

"We conclude that TRF-15 falls within constitutional parameters, because its guidelines permit a vehicle to be diverted to secondary screening only when the officer has a reasonable suspicion, based on articulable facts, that the driver has committed an OUI violation or another violation of law.  The second question presented is whether TRF-15 allows a constitutionally impermissible amount of discretion to the initial screening officers to question drivers when there is no indication of intoxication.  We conclude that, as a result of the orders and instructions in the operations plan that governed this sobriety checkpoint and supplemented the guidance provided by TRF-15, the discretion provided to the initial screening officers in greeting motorists was appropriately limited to pass constitutional muster."

[2] The Written Operations Plan and Officer's Directives consists of a number of different documents, including a copy of TRF-15; briefing notes for the troopers who participate in the sobriety checkpoint; an order from the State police division commander; a "Site Problem/Selection Sheet," which explains why the sobriety checkpoint was located near Artesani Park and contains a diagram of the area; a written order from the Troop H commander to Captain Ball, outlining his responsibilities as the detail commander; a news release about the sobriety checkpoint; a duty assignment sheet and duty roster form; an activity log; a data collection sheet; and some legal guidance.

lights flashing.  An illuminated board with an arrow directs vehicles to move to the right and to enter a "cone taper," a single lane created by traffic cones.  A series of six signs informs motorists to be prepared to stop and that they are approaching a sobriety checkpoint.  At some point while in this lane, vehicles are required to briefly stop.  The operator is greeted by a uniformed member of the State police, who performs an initial screening function based on an observation of the operator and the manner in which the operator responds to the officer's greeting.  Typically, the greeting officer states, "Hello, this is a State police sobriety checkpoint.  How are you tonight?"  See Commonwealth v. Swartz, 454 Mass. 330, 332 (2009).  Unless the greeter detects signs of impairment due to the consumption of an alcoholic beverage ("glassy, red, bloodshot eyes, odor of alcoholic beverage, slurred speech"), or evidence that another crime is being committed, the driver of the vehicle is waved on through the checkpoint.  The initial stop takes less than one minute.  If the greeter suspects that the driver is under the influence of alcohol, the driver is directed to a screening location where a different trooper is stationed.  During the second screen, the trooper engages the driver in conversation and may ask the driver if he or she has consumed any alcohol.  If there is confirmation of the initial suspicion of impairment due to the consumption of alcohol, the

second screener may request that the driver perform field sobriety tests.  See Commonwealth v. Murphy, 454 Mass. 318, 321 (2009).  The second screening involves a longer detention that may last ten to fifteen minutes.  As a result of this second screening, the motorist is either placed under arrest or allowed to proceed through the checkpoint.

In his capacity as the officer in charge, Captain Ball's responsibilities included briefing the troopers and officers assigned to the sobriety checkpoint, each of whom received a packet of information and instructions (including the operational plan and the rules, regulations, and case law that govern sobriety checkpoints).  He also drove his vehicle through the checkpoint before it became operational to ensure that the signage was proper and that it was safe for motorists. Periodically during the operation of the checkpoint, Captain Ball walked through it to ensure the checkpoint was being conducted according to the operational plan.  The operational plan required that every vehicle entering the checkpoint would be subjected to preliminary screening; the officers staffing the checkpoint were not given discretion to pick and choose the vehicles to be screened.  As the officer in charge, Captain Ball was authorized to suspend the screening for safety reasons if there was a backup of vehicles.  In that case, all vehicles

would be waved through the checkpoint until the screening function was resumed.[3]

On the night in question, approximately 1,180 vehicles entered the checkpoint and encountered the trooper serving as the greeter, and "[f]ifty-something" vehicles received secondary screening. Sergeant Nasuti, also of the State police, greeted the defendant at the checkpoint. While speaking to Sergeant Nasuti, the defendant admitted to having consumed alcohol that night. Sergeant Nasuti observed that the defendant had glassy, red eyes and smelled of an alcoholic beverage. The defendant was sent for further screening based on Sergeant Nasuti's observations. Based on the observations made during the secondary screening, the defendant was arrested.

Discussion. When reviewing a judge's findings and rulings on a motion to suppress evidence, we accept the judge's subsidiary findings of fact unless it is shown that there is clear error, but we make an independent determination whether the judge correctly applied constitutional principles to the facts as found. See Commonwealth v. Ocasio, 434 Mass. 1, 4 (2001). The constitutional provisions governing this case are well established. The stop of the defendant's vehicle was a

---

[3] On the evening in question, a backup did occur at one point, and about eighty vehicles were waved through the checkpoint without screening.

warrantless seizure without individualized suspicion.  <u>Murphy</u>, 454 Mass. at 322.  "In determining whether such seizures are reasonable, we have recognized that we must balance the strong public interest in reducing the number of persons who die each year on our highways from alcohol-related accidents against the individual's right to personal security free from arbitrary interference by law officers" (quotations omitted).  <u>Id</u>.

The sole question before us is whether the judge was correct in concluding that the roadblock in question was unlawful because the selection of the timing and location of the roadblock on Soldiers Field Road was in violation of constitutional standards and State police policy.  In order for a sobriety checkpoint to meet the constitutional test of reasonableness,[4] "the selection of motor vehicles to be stopped must not be arbitrary, safety must be assured, motorists' inconvenience must be minimized, and assurance must be given that the procedure is being conducted pursuant to a plan devised by law enforcement supervisory personnel."  <u>Id</u>. at 323, quoting <u>Commonwealth</u> v. <u>McGeoghegan</u>, 389 Mass. 137, 143 (1983).  To this end, State police policy, as reflected in the record on appeal, provides that police administrators and supervisors must select

_____

[4] The factors that must be considered in determining the constitutionality of sobriety checkpoints are the same under State and Federal law.  <u>Murphy</u>, 454 Mass. at 323 n.5.

a site "where accidents or prior arrests for drunken driving have occurred . . . ."[5] In addition, the troopers and officers assigned to a sobriety checkpoint must comply strictly with the State police guidelines and the specific plan developed for each sobriety checkpoint. See Commonwealth v. Anderson, 406 Mass. 343, 349 (1989) ("Adherence to a neutrally devised, preplanned blueprint in order to eliminate arbitrariness and discretion has

---

[5] The quoted language can be found in the "Site Problem/Selection Sheet" used to select the Soldiers Field Road sobriety checkpoint location in the present matter, and is a direct quote from State police guidelines for roadblocks promulgated in 1983. In Commonwealth v. Trumble, 396 Mass. 81, 89 (1985), the Supreme Judicial Court determined that the 1983 guidelines satisfied the constitutional requirements set forth in McGeoghegan, 389 Mass. at 143. The 1983 guidelines provided, in pertinent part:

> "SITE SELECTION: Problem areas -- where accidents or prior arrests for drunken driving have occurred. Specific areas to be selected by respective administrators and supervisors.
>
> "A. Individual site selection should be based on selective enforcement identifiers as to time, place and cause of prior serious injury accidents.
>
> "B. Site should allow officers to pull vehicles out of the traffic stream without causing a significant intrusion to them and/or creating a safety hazard because of a traffic back-up. It is suggested that areas adjacent to rest areas or parking lots be utilized.
>
> "C. Selected sites should allow for visibility of on-coming motorists, safety for stopped vehicles, as well as safety for the officers."

Trumble, supra at 92.

been this court's principal prerequisite for abandoning the requirement of individualized suspicion in roadblock stops").

In the present case, the judge found that TRF-15 and the other policies governing the roadblock at issue comported with the McGeoghegan principles. He rejected the defendant's claims that the State police troopers and officers conducting the sobriety checkpoint were impermissibly given discretionary authority over when to wave vehicles through the roadblock and when to stop them, and that the State police failed to give the public sufficient advance notice of the roadblock. However, the judge determined that the selection of the site and timing for the roadblock was unreasonable and in violation of State police policy and the State and Federal Constitutions because it was not based on sufficient statistical data.

In keeping with the 1983 guidelines approved in Commonwealth v. Trumble, 396 Mass. 81, 89 (1985) (see note 5, supra), TRF-15 requires that the selection of the site for a sobriety checkpoint "shall be made based upon selective enforcement identifiers of alcohol related traffic crashes or prior OUI violations such as:  [t]ime; [d]ay of the week; and [l]ocation."  TRF-15 does not require that the site selected be one where any minimum number of alcohol-related arrests were made or accidents occurred, or where the most such events occurred.  It also expressly requires that the supervisory law

enforcement officers who select the site take into account "[s]afety considerations," including the safety of motorists and the police, as well as "[s]ight visibility; [t]raffic volume and pattern; [o]perator reaction time; and [o]perator stopping distance."

The reason why the site ("Soldiers Field Road, at the intersection of Artesani Park, in the Brighton section in the city of Boston") was selected in this case is explained in the "Site Problem/Selection Sheet," prepared by the State police and part of the record on appeal. It contains the following statement:

> "State Police Policy and case law state . . . that site selection must be a problem area, one where accidents or prior arrests for drunken driving have occurred and based upon selective enforcement identifiers of alcohol related traffic accidents or prior OUI violations.

> "The records of the State Police Brighton Barracks were searched for statistical data showing a high incidence of OUI arrests and accidents resulting in OUI arrests in the surrounding area and roadways leading to Soldiers Field Road, Brighton. From May 14th, 2014 to May 9th, 2016 there were 167 OUI arrest [sic] made by the State Police Brighton Barracks, 83 arrests were in the City [of] Boston and 83 of those arrests were on Soldiers Field Rd[.] or the Roadways leading to Soldiers Field Rd."

The judge concluded that the analysis by the State police for the site selection in this case was constitutionally inadequate because (1) it lacked justification for the time of day and day of the week (a weekend versus a weekday) selected, (2) it lacked justification for the selection of Soldiers Field Road versus

one of the roads leading to Soldiers Field Road, and (3) the total number of alcohol-related arrests over a two-year period (eighty-three) was not significant enough to establish that Soldiers Field Road was a "problem area."

With regard to the decision to select Saturday, May 14, 2016, beginning at 11:30 P.M. until Sunday, May 15, 2016, at 3 A.M. as the date, time, and duration of the sobriety check point, we agree with the Commonwealth that neither State police guidelines nor constitutional reasonableness requires the police to demonstrate empirically the precise day of the week and time of day when the most arrests and accidents have previously occurred, and then to choose that day and time for establishing a sobriety checkpoint. Rather, it was reasonable for the State police to select a Saturday in the late evening into the early morning hours of a Sunday to operate the sobriety checkpoint, as it is widely known that these are the hours when many people are driving home from movie theatres, restaurants, bars, and other entertainment venues in and around the city of Boston where alcoholic beverages are served. See G. L. c. 138, § 12 (alcohol may not be served by licensed establishments after 2 A.M.). It also was reasonable for the State police to assume that among the population of working adults, fewer people are required to work on Sunday morning than on other days. For these reasons, it was reasonable for the State police to assume that there

would be as high a percentage (if not a higher percentage) of impaired drivers among the people operating motor vehicles in the late evening and early morning hours of Saturday into Sunday, as compared to any other night of the week.  Here, the determination by the State police of the date and duration of the sobriety checkpoint satisfied the requirement that "the roadblock meet standard, neutral guidelines."  Anderson, 406 Mass. at 347.  The State police guidelines also expressly require that law enforcement supervisors consider the safety of motorists in determining site selection.  If the police choose a time of day or night when there is expected to be a very high volume of vehicles, there is a greater risk of accidents unrelated to alcohol impairment, as well as the likelihood that due to backups, more vehicles would be waved through the checkpoint without being screened.

With regard to the selection of Soldiers Field Road versus one of the roads leading to Soldiers Field Road, we have observed that site selection must be "based on fresh, reliable information" and not left to the discretion of the State police. Commonwealth v. Donnelly, 34 Mass. App. Ct. 953, 955 (1993).  We conclude that such "fresh" and "reliable" data was used in this case.  At the motion hearing, Captain Ball testified that before deciding where a roadblock will be located, the troop commander compiles information regarding the areas with "high inciden[ce]

of OUI infractions."  In this case, the evidence was collected over the course of the two years preceding the sobriety checkpoint, up to and including five days before the checkpoint was conducted.  The evidence provided showed that of the 167 alcohol-related arrests made by troopers assigned to the Brighton barracks in that two-year period, eighty-three of the arrests occurred on Soldiers Field Road or the roads leading to Soldiers Field Road.  This is not a case where outdated reports were relied upon for site selection.  The statistics here were "compiled continuously" and covered a full two years of relevant information.  Contrast Donnelly, 34 Mass. App. Ct. at 954-955 (judge should have allowed motion to suppress where roadblock was conducted in late 1989, the only evidence of prior alcohol-related incidents was from 1987, and results of recent roadblocks in the same area were not offered in evidence). Insofar as the judge understood the Constitution or TRF-15 to require the police to identify the location of the eighty-three alcohol-related arrests more precisely than by indicating they occurred on Soldiers Field Road and the roads leading to Soldiers Field Road, we do not believe that such a degree of precision is required.[6]

---

[6] While the defendant argued at the hearing on the motion to suppress that the statistical data was not sufficient to establish why the sobriety checkpoint was sited in the location in question on Soldiers Field Road, there was no evidence

The judge also reasoned that even if it were assumed that all eighty-three of the past arrests were made on Soldiers Field Road, that number of arrests over a two-year period was not sufficient to support labeling Soldiers Field Road a "problem area." We do not agree. In Commonwealth v. Amaral, 398 Mass. 98 (1986), where the Supreme Judicial Court determined that a roadblock carried out without a plan drawn up by law enforcement supervisory personnel and without any advance notice to the public did not meet constitutional standards, the court added that "[a]nother factor that tends to eliminate arbitrariness is the selection of a roadblock site because it has been a problem area, one 'where accidents or prior arrests for drunken driving have occurred.'" Id. at 101, quoting the 1983 guidelines reviewed in Trumble, 396 Mass. at 92. In Donnelly, we explained that the critical element that differentiates a site selection that meets constitutional standards from one that does not is the nature of the data used to make the selection. "By relying on reports that are two years old, combined with the failure to produce recent, pertinent information which the State police generated and which does not appear to have been unavailable for the trial, the Commonwealth converted the site selection from a choice based on fresh, reliable information to a choice made by

presented that there was another suitable location in the area or on any of the roadways leading to Soldiers Field Road.

the State police in their discretion.  The necessary adherence to the Commonwealth's own guidelines was not satisfied . . . ." 34 Mass. App. Ct. at 955.

In the present case, unlike in Amaral and Donnelly, supervisory law enforcement personnel selected the site for the roadblock in compliance with State police guidelines and on the basis of "fresh, reliable" crash and arrest data, namely data from the two-year period immediately preceding the roadblock that was compiled by the State police Brighton barracks. Neither the Supreme Judicial Court nor this court has previously required the police to demonstrate any minimum number of alcohol-related arrests or accidents that must have occurred in a location before it may be the site of a roadblock.  To require a strict correspondence between the site selected for a sobriety checkpoint and the precise location of the largest number of alcohol-related arrests over time or a minimum number of alcohol-related arrests per week or per month at the location selected for a sobriety checkpoint is another way of demanding that in order to meet the test of reasonableness, a sobriety checkpoint must represent the least intrusive alternative among all the choices available for the enforcement of G. L. c. 90, § 24.  This line of reasoning was rejected in Commonwealth v. Shields, 402 Mass. 162, 165-168 (1988).  Furthermore, in selecting the site for a sobriety checkpoint under TRF-15, as

noted earlier, supervisory law enforcement personnel must consider the safety of motorists and law enforcement personnel. See Trumble, 396 Mass. at 89.

These considerations demonstrate that the selection of the site for a sobriety checkpoint requires the exercise of discretion by supervisory law enforcement officials, who must take into account safety and convenience factors as well as the number of alcohol-related arrests.[7]  In the present case, the judge concluded, as a matter of law, that it was unreasonable for the commanding officer of the State police troop in question to select a site on Soldiers Field Road for a sobriety checkpoint based solely on data indicating there were eighty-three arrests in the prior two years (on average, three and one-half arrests each month) for alcohol-related offenses in the

---

[7] The exercise of discretion by supervisory law enforcement officers in selecting the site for a sobriety checkpoint must be distinguished from the need by law enforcement to follow a guideline such as TRF-15 that strictly limits the discretion that may be exercised by law enforcement personnel carrying out the roadblock.  See Murphy, 454 Mass. at 323 ("Because sobriety checkpoints, by their very nature, initially stop drivers without any individualized suspicion, giving police officers such discretion poses too high a risk that the discretion will be standardless and unconstrained" [quotation omitted]); id. at 325 ("police officer discretion in deciding whom to stop must be severely circumscribed by clear guidelines").  See also Commonwealth v. Aivano, 81 Mass. App. Ct. 247, 250 (2012) ("the linchpin for determining the constitutionality of a roadblock is the use of a predetermined plan, developed by supervisory law enforcement personnel, to eliminate the exercise of discretion by law enforcement personnel in the field").

area because that number of arrests was not sufficiently indicative of the location being a problem area. This reasoning focuses exclusively on the value of sobriety checkpoints as a means of detecting impaired drivers and not at all on their value in deterring people from driving when under the influence of alcohol.[8] Neither TRF-15 nor the prior decisions of the Supreme Judicial Court or this court provide support for such a limited understanding of the reasonableness requirement under the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights.

Conclusion. For the above reasons, the order allowing the defendant's motion to suppress is reversed, and a new order shall enter denying the motion.

---

[8] The Division Commander's Order, 15-DFS-044 (2015), which is part of the supporting documentation for the sobriety checkpoint in this case, indicates that "sobriety checkpoints" are one of a number of "highway safety mobilizations" designed "to achieve reductions in fatal and personal injury motor vehicle crashes and create a safer and more efficient highway transportation system within the Commonwealth . . . ." In McGeoghegan, 389 Mass. at 143-144, the Supreme Judicial Court noted that high visibility police activities like sobriety checkpoints "may achieve a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means." And, in Shields, 402 Mass. at 167 n.3, the court stated that "[t]he strong State interest in eliminating the carnage caused by drunk drivers, . . . sets roadblocks to enforce c. 90, § 24, apart from roadblocks for other purposes" (quotation omitted). These cases recognize that carefully regulated, high visibility law enforcement activities may have a deterrent effect that cannot be achieved by traditional enforcement measures.

<u>So ordered</u>.